James D. HODGSON, Secretary of Labor, Petitioner-Appellant,

v.

LODGE 851, INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL-CIO, Defendant-Appellee.

No. 71-1107.

United States Court of Appeals, Seventh Circuit.

Dec. 9, 1971.

Rehearing Denied Jan. 13, 1972.

Stevens, Circuit Judge, dissented and filed opinion.

L. Patrick Gray, III, Asst. Atty. Gen., Civil Div., Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., James R. Thompson, U. S. Atty., Chicago, Ill., for petitioner-appellant.

Michael D. Block, Joliet, Ill., for defendant-appellee.

Before KILEY, PELL and STEVENS, Circuit Judges.

PELL, Circuit Judge.

This case arises out of a local union's election of officers conducted on December 21, 1969. Six days later, a member in good standing of the local, Local 851, protested the conduct of the election and made the appropriate application for internal union relief. After waiting three months and receiving no satisfactory answer to his complaints, he filed a complaint with the Secretary of Labor under § 402(a) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 482(a). The Act then provided that:

> "The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization . . . to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary. . . ." 29 U.S.C. § 482(b)

The Secretary proceeded to investigate the complaint. Approximately one month before the expiration of the 60 day period referred to above, the Secretary obtained a letter signed by the President of Lodge 851 and the Vice President of the International Union stating:

> "It is hereby agreed that the time within which the Secretary of Labor may bring suit for any and all causes of action arising from or relating to LMWP's [Office of Labor-Management and Welfare-Pension Reports] investigative findings with regard to the challenged election be extended from May 2, 1970 to July 1, 1970.

> "It is further agreed that Local Lodge 851 and the International Association of Machinists and Aerospace Workers, said local union's parent body, both individually and together, hereby waive any and all defenses relating to the timeliness of any act or action required to be taken by the Secretary of Labor under Section 402 of the LMRDA which it or they might otherwise have to the causes of action referred to above."

The Department of Labor's reply letter of May 6, 1970, contained the following statement:

> "In consideration of this waiver, legal proceedings will not be initiated by the Department of Labor at this time, but the right of the Secretary to initiate such proceedings is reserved until July 1, 1970."

The policy of obtaining such waivers of the 60 day time period was, admittedly, a common practice in these cases and had been standard policy of the Department of Labor since the passage of the Act in 1959.

On June 30, 1970, the Secretary, having concluded his investigation and having been unable to negotiate an agreement for a new election with the union, filed a complaint against Lodge 851 alleging three specific violations of the Act. The union moved to dismiss the complaint on the ground that it had not been filed within the statutory 60 day period. The court below, apparently relying heavily on the district court's

opinion in Shultz v. International Printing Pressmen and Assistants' Union of North America, Civil No. 2288 (E.D. Tenn., filed May 6, 1970), dismissed the case, Shultz v. Lodge 851, No. 70 C 1579 (N.D.Ill., filed October 29, 1970). It is from that dismissal that this appeal was taken.

■ First, we must note that the *Pressmen* case, *supra*, upon which the court below principally relied, has been reversed by the Sixth Circuit, Hodgson v. International Printing Pressmen, 440 F.2d 1113 (6th Cir. 1971), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56. In a well reasoned opinion by Judge Edwards (in which Associate Justice Clark and Circuit Judge Celebrezze concurred), the court held that the "union's voluntary waivers which were relied upon by appellant may be pled by appellant Secretary of Labor as an equitable defense to estop the otherwise mandatory bar of the statute." 440 F.2d at 1115. Although we are satisfied with the result, as well as the reasoning of the Sixth Circuit, it is necessary to examine those arguments of defendant union here which it is claimed were not considered by the *Pressmen* court.

Defendant first states that since § 402 of the Act was drafted in the form of an election law, it should be treated in the same manner as other election laws, which, as generally interpreted, require the timely filing of a complaint as a prerequisite to relief.[1]

We cannot agree with this contention since the election process remedies of the LMRDA have certain unique characteristics which distinguish it from state political election laws.

In Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), the Supreme Court stated:

"Reliance on the discretion of the Secretary is in harmony with the general congressional policy to allow un-

ions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion *before resort to the courts*." 379 U.S. at 140, 85 S.Ct. at 296. (Emphasis added.)

While the above statement was not directly involved in the decision of the point before the court, it does show clearly that an integral part of the remedial structure of Title IV was to be negotiation between the Secretary and the union to the end of reaching, if possible, a voluntary and non-litigated settlement. The Court's language as above set out was quoted with approval in Wirtz v. Bottle Blowers Ass'n, 389 U.S. 463, 472, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968).

In contrast, state election laws by their nature have no place for negotiations between the candidates and the election board to determine whether or not a new election will be held. The courts are the sole arbiters of that decision. Reference to such political processes is, therefore, not relevant to the present case.

Local 851 next advances the argument that the word "shall" in §.402(b) of the Act means that the filing of a complaint within 60 days is a condition precedent to the existence of a cause of action, *i.e.*, that it is a jurisdictional element. If this is so, then the rule that parties cannot confer jurisdiction on a court by agreement would apply and the dismissal of the complaint would have been proper.

At one time, a statute which created a new cause of action and which included a time limitation was interpreted as making the time limitation a jurisdictional (or substantive) element of the cause, such that it could not be waived even though the parties both desired to do so. The theory was that the timely

---

1. One notable exception to this rule is In re Brady, 246 App.Div. 561, 282 N.Y.S. 964 (2nd Dept., 1935), in which the court held the time period for filing a complaint to be directory and not mandatory.

filing was a condition precedent to the right and not merely to the remedy. This theory was criticized in Developments in the Law—Statutes of Limitation, 63 Harv.L.Rev. 1177, 1186–87 (1950) and Note, Clayton Act Statute of Limitations and Tolling by Fraudulent Concealment, 72 Yale L.J. 600, 605 (1963). However, prior to these articles the Supreme Court in at least one case had declared that legislative intent was controlling over such court-made rules of statutory interpretation.[2] Finally, in Burnett v. New York Central R. Co., 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), the Court explicitly rejected the older view.[3]

We also reject the rule proposed by defendant in this case that a time limitation included in a statutory scheme is a priori jurisdictional. Rather it is necessary to examine the intent of Congress in passing this Act.

A subsidiary argument presented by Local 851 is that since the Supreme Court has interpreted the word "shall" as a mandatory statement to the courts in § 402(c) of the Act (Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968), wherein it was held that an election which occurs subsequent to the contested election does not make the Secretary's suit moot, but rather that a court *must* order a new election if it finds that the old one was in fact invalid), the same mandatory meaning of the word is necessitated in § 402(b).

While we recognize that "shall" in many contexts is equated with "must," we do not conceive that this result is automatic in all situations, certainly not in the present one. Nor do we find any sequiturish interpretations imposed upon one subsection of the Act dealing with the discretionary duties of the Secretary simply because the courts have a mandatory duty under a different subsection of the Act.

Local 851 contends, however, in any event the intent of Congress was that

2. "Origin of the right is not *per se* conclusive whether the limitation of time 'extinguishes' it or 'merely bars the remedy' with the accepted alternative consequences respecting waiver. Source is merely evidentiary, with other factors, of legislative intent whether the right shall be enforceable in any event after the prescribed time, which is the ultimate question." Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 360, 64 S.Ct. 128, 130, 88 L.Ed. 96 (1943). In that case, only after it had made a careful study of the legislative history of the Interstate Commerce Act did the Court declare that the period for filing claims could not be extended by express agreement since it found such agreements to be invalid as contrary to the intent of Congress.

3. "The distinction between substantive and procedural statutes of limitations appears to have arisen in cases involving conflicts of laws, see The Harrisburg, 119 U.S. 199, [7 S.Ct. 140, 30 L.Ed. 358]; Davis v. Mills, 194 U.S. 451, [24 S.Ct. 692, 48 L.Ed. 1067]; Restatement of the Law, Conflict of Laws § 605. While the embodiment of a limitation provision in the statute creating the right which it modifies might conceivably indicate a legislative intent that the right and limitation be applied together when the right is sued upon in a foreign forum, the fact that the right and limitation are written into the same statute *does not* indicate a legislative intent as to whether or when the statute of limitations should be tolled. Thus the 'substantive'-'procedural' distinction would seem to be of little help in deciding questions of extending the limitation period." 380 U.S. at 427, n. 2, 85 S.Ct. at 1054. (Emphasis added.) *See also*, Kansas City, Missouri v. Federal Pacific Electric Co., 310 F.2d 271, 282–283 (8th Cir. 1962), cert. denied, 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962) (§ 4 Clayton Act treble-damage action); United States v. Southern Pacific Company, 210 F.Supp. 760, 762 (N.D.Cal.1962) (Federal Tort Claims Act); Myers v. Stevenson, 125 Cal.App.2d 399, 270 P.2d 885, 889 (1st Dist., 1954) (injuries negligently inflicted upon the plaintiff before birth). Moreover, it is clear that all statutory periods can be tolled in the case of fraudulent concealment. Bailey v. Glover, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636; Exploration Company v. United States, 247 U.S. 435, 38 S.Ct. 571, 62 L.Ed. 1200 (1918). If courts can view the fraudulent concealment exception as being implied by Congress, then clearly there is not an a priori rule here.

the 60 day requirement should not be subject to waiver. Normally a statute of limitations is "designed to assure fairness to defendants," Burnett v. New York Central R. Co., *supra*, 380 U.S. at 428, 85 S.Ct. at 1054, by eliminating surprise and stale claims. The union claims neither in this case but relies on the intent of Congress as expressly related to the purposes of the LMRDA.

In support of this phase of its argument the union cites the "well established principle that a statutory right conferred on a private party, but affecting the public interest, may not be waived." While this rule may be true in some cases, it has no application here since the Secretary of Labor is not a private party in the usual sense of the term. Rather the Secretary is told to determine probable cause, much as a public prosecutor does. Although the Secretary's role is not solely that of a defender of public interest since he is also, in part, prosecuting a private claim,[4] this element is present to a great enough extent to make the rule proposed here by Local 851 irrelevant to the present case.

Next the union argues that Congress could not have intended such waivers to be obtained from the very union officials whose elections are being challenged. As in politics it seems that litigation makes strange bedfellows for the union is here contending that the rights of the dissident union members are not being protected although presumably denying that they were violated in the election in question. Although this question comes before us in this rather odd stance due to the exigencies of litigation, it is still significant in determining the Congressional intent.

The union's letter waiving any time limitations in filing suit was signed by the President of the Lodge, whose election was being contested, and by the Vice President of the International, who, as noted by the defendant, is not a member of the local. Defendant contends that Congress could not possibly have intended that these two people should have the power to waive the 60 day limitation. We reject this view for several reasons.

First, the Act itself makes the Secretary of Labor the instrument for protecting Title IV rights and for prosecuting claims of improper election activities. It is not the president of the local who is assigned the duty of protecting these rights, but rather the Secretary and it is his discretion which should be at question. Since the Secretary has been granted discretion under the Act,[5] as noted in Calhoon v. Harvey, *supra*, it is clear that if he determines that such a waiver would expedite handling of this matter, this would not be, a priori, a violation of the Congressional mandate. Although his actions would be open to

---

4. It should be noted that the House version of the LMRDA provided that the union member should prosecute the claims of violation of Title IV rights. The conference committee accepted the Senate version giving this power to the Secretary. Senator Goldwater stated regarding this decision:

". . . the approach of the Senate bill is substantively preferable in its reliance on Government, rather than exclusively individual, enforcement action. Since the election standards are designed to insure honest elections for the benefit of all union members as a matter of public policy, their violation is a matter of public rather than exclusively individual concern, and should be enforcible in the same way as the trusteeship standards of the bill." Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, Titles I–VI, p. 830. (Dept. of Labor, U.S. Solicitor)

5. "The Secretary is directed to investigate the complaint and determine whether there is probable cause to believe that an election was not held in conformity with the requirements of the bill. Since an election is not to be set aside for technical violations but only if there is reason to believe that the violation has probably affected the outcome of the election, the Secretary would not file a complaint unless there were also probable cause to believe that this condition was satisfied." Senate Report No. 187 on Senate Bill 1555, April 14, 1959, from Legislative History of the LMRDA, *supra*, at 778, U.S.Code Cong. & Admin.News, p. 2337.

challenge as an abuse of discretion,[6] the existence of such discretion unless it was not intended by Congress, is acceptable.

The Secretary represents the position of the dissidents so that a proper adversarial system may exist.

A second consideration as to the propriety of incumbent officers executing such waivers arises from the Act itself which states that the "challenged election shall be presumed valid pending a final decision thereon . . . and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide."[7]

There is no showing here of a contra provision of the union's constitution or bylaws and under the Act it seems clear that the local president is the proper party in this case to sign a waiver of any of the local's rights even though his election has been challenged.

Finally, the defendant comments that the letter was also signed by the International Vice President who was "not a member of the local." The implication is that the International should have nothing to do with local elections. But once again this is refuted by the language of the Act itself which provides a three month period in which the complaining union member must exhaust internal union remedies, that is, he must, *inter alia*, take an appeal to the International union.

Furthermore, the Act in § 302 provides that the International can impose a trusteeship on a local "for the purpose of correcting corruption . . ., restoring democratic procedures, or otherwise carrying out the legitimate objects

of such labor organization." To imply that the International has no role to play in post-election remedies is to ignore the plain words of the Act itself.

Local 851, however, argues that waivers of the 60 day time period would contravene the intent of Congress that such cases should be processed expeditiously. Senate Bill 3974, passed by the Senate in 1958, was the precursor of the LMRDA. The bulk of the bill actually signed to into law a year later appeared in the 1958 version. That version contained the following language in lieu of the 60 day period actually enacted in § 402(b):

> "The Secretary shall investigate such complaint and if he finds probable cause to believe that a violation of this Act has occurred and has not been remedied, he shall, *within thirty days of filing of such complaint, or as soon thereafter as possible but in no event after sixty days,* bring a civil action against the labor organization. . . ." S.3974, § 302(b). (Emphasis added.)

The next year when the bill was reintroduced, the above clearly mandatory language as to time of filing by the Secretary had been eliminated and in its place was simply "within sixty days." § 302(b), Senate Bill 505 as introduced by Senator Kennedy in 1959. There was no reason given for the change in wording in any of the committee reports or the debates on the bill (totalling in excess of 1000 pages). Whether one can say that the removal of the mandatory language meant that the time was to be discretionary or that it was just a shorthand way of stating the same mandatory period is, without reference to other por-

---

6. *See,* Schonfeld v. Wirtz, 258 F.Supp. 705 (S.D.N.Y., 1966), in which Judge McLean held that if a union member could show that the Secretary had abused his discretion by failing to file suit to have an election set aside after finding substantial violations of Title IV, then the district court could grant relief. It should be noted that in those circumstances the 60 day period would certainly be outrun

but the court did not view the period as mandatory. *See also,* Judge Gesell's opinion in DeVito v. Shultz, 300 F.Supp. 381 (D.D.C., 1969); *contra,* Katrinic v. Wirtz, 53 LC ¶ 11,289 (D.D.C.1966) and McArthy v. Wirtz, 55 LC ¶ 11,944 (E.D. Mo.1967).

7. § 402(a) LMRDA, 29 U.S.C. § 482(a).

tions of the Act and the general intent of Congress, mere conjecture. Persuasive, but non-conclusive, arguments may be made for either interpretation. Therefore, we turn to an examination of the LMRDA of 1959 as a whole and especially Title IV in order to find how this provision was intended to be interpreted.

The two goals of the Act which seem to be in conflict here are, first, the desire "to allow unions great latitude in resolving their own internal controversies, and . . . bringing about a settlement through discussion before resort to the courts," Calhoon v. Harvey, *supra*, 379 U.S. at 140, 85 S.Ct. at 296, 13 L.Ed.2d 190, and second, the need for "an effective and expeditious remedy for overthrowing an improperly held election. . . ." (Senate Report No. 187 on Senate Bill 1555 (1959), p. 21) U.S. Code Cong. & Admin.News, p. 2338. The Secretary contends that he has the discretion to obtain these waivers and that such waivers are essential in implementing both policies.

Certainly, the waivers, providing more time to negotiate a settlement, serve the first purpose of avoiding resort to the courts for a solution. The second goal is not quite as obviously aided by this policy. In the ordinary civil case, the filing of a lawsuit does not limit negotiations, and in fact may speed a settlement. The labor situation with which we are dealing is admittedly quite different from the ordinary lawsuit. A union leader is a quasi-political figure and a public charge of improper conduct by a Government agency may serve only to harden the union's desire to avoid a settlement as long as possible, maintaining the appearance of rectitude.

Additionally, by forcing the union to take a public position and thereby potentially freezing the bargaining, the Secretary will have to litigate marginal cases which could easily be settled without a suit. It is our belief that Congress, had it been directly confronted with this issue,[8] would have favored giving the Secretary this discretion, as it did in other areas of Title IV. Moreover, the Secretary's assertion that this practice of pursing a negotiated settlement beyond the 60 day period without filing suit has been successful is well-documented by affidavits in the record which are uncontested.

The Senate Report No. 187 while stating that the remedy was to be expeditious also said it was to be effective. That the procedure has been effective is demonstrated by the fact that between July 1, 1962 and June 30, 1969 the Labor Department conducted 329 investigations which disclosed actionable violations. 175 of these cases were resolved without litigation when the labor organizations involved agreed to remedy the violations found.

The LMRDA, having been stripped of pre-election relief in Calhoon v. Harvey, *supra*,[9] and subsequent decisions, is necessarily restrained in expeditious rectification of election violations. Post-election remedies are inevitably less effective[10] and Congress has built into the system a substantial delay of approximately five months before suit is to be filed.[11]

---

8. We have assumed in the absence of any showing that there was no direct confrontation although as previously indicated in this opinion it could be persuasively argued that Congress was aware of the possible problem and therefore intentionally dropped the clearly mandatory language contained in the 1958 bill.

9. A decision this aspect of which has been criticized on both legislative history and policy levels, e. g., Wellington, Labor and the Legal Process (1968) p. 206 et seq., but which nevertheless is the controlling case as to *pre-election* remedies.

10. Statement of Clyde W. Summers, Hearings on Union Financial and Administrative Practices and Procedures before the Subcommittee on Labor of the Committee on Labor and Public Welfare, 594, 613, 85th Cong., 2d Sess. (1958).

11. This period may be substantially longer since the 3 month period for internal union relief does not start to run until the date the complaint is filed with the union.

If we are to encourage the Secretary actually to litigate each case, rather than concentrate on obtaining a voluntary agreement, the delay between election and remedy is threshold-defeating. One recent study of this question has stated that:

"Although litigation is always available as the ultimate remedy, voluntary compliance is a more viable alternative because it is less time consuming and irritating. . . . From the standpoint of promptness of relief, litigation is the least satisfactory method of remedying a Title IV violation. . . . After pre-trial preparation and the inevitable delays occasioned by the crowded federal dockets, a case would come to trial in about one to one and one-half years after the action was commenced." Note, The Election Labyrinth: An Inquiry into Title IV of the LMRDA, 43 N.Y.U.L.Rev. 336, 365 & 375 (1968).

While it is a truism that litigation cannot come to a conclusion unless it is first initiated, with the current congestion of court calendars it seems naive to assume that the mere filing of a suit will ipso facto accomplish an expeditious disposition of a claim.

■ In light of these factors, we conclude that Congress did intend the Secretary to have some discretion here to say that the case could be handled more expeditiously by such an extension as might be reasonably necessary in order to encourage negotiation. This is admittedly an inference from a consideration of Title IV as a whole, but it is necessary here since we are of the opinion that Congress never expressly considered this issue and we must therefore try to decide how Congress would have acted if the issue had been squarely before it on these terms.

I.M. § 473.400. In the present case that period was only 6 days, but the time limit there is set by the union constitution only. In addition, once the 3 months period has expired the union member has

We do not hold that the discretion is unlimited, timewise, but in the present case we cannot say that a 30 day extension was such an abuse that sanctions should be imposed. Furthermore, in general, the abuse of discretion will not be challenged by the unions, but by the dissident members who have filed the complaint with the Secretary. We approve of the decisions noted above, Schonfeld v. Wirtz, supra, and DeVito v. Shultz, supra, which hold that the Secretary's decisions can be challenged if they constitute an abuse of discretion, and in passing note that the Administrative Procedure Act is applicable to this section by virtue of Section 606 of the LMRDA.

Thus, the two goals sought by Congress are effectively realized (or at least as much as possible) by permitting the Secretary some discretion in obtaining these waivers, but, as with his other decisions in this area, the dissident union members are protected by the Administrative Procedure Act and the right to judicial review against an abuse of discretion by the Secretary in obtaining excessive extensions or failing to prosecute meritorious claims. 5 U.S.C. § 706.

In addition, we cannot be unmindful, in determining the intent of Congress, of the fact that the Secretary has been obtaining these waivers since the inception of the Act and that there has never been any complaint or remedial legislation by Congress as to this pattern of action. See, Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), as to the deference to be given to such long-standing contemporaneous administrative determinations.

We must next briefly consider defendant's contention that the Sixth Circuit improperly applied the law of waiver and estoppel to this issue in the Pressmen case, supra. First, it should be not-

1 month to file a complaint with the Secretary who then has at least 60 days to investigate before he decides whether or not to bring suit.

ed that we have determined above that the 60 day period is not jurisdictional, but rather more like a statute of limitations. Although the Sixth Circuit found that the period was mandatory and de-emphasized the waiver issue in favor of the estoppel, our determination leads us, first, to consider the waiver question. It has long been held that a statute of limitations is a personal defense whose protections can be waived. Allen v. Smith, 129 U.S. 465, 470, 9 S.Ct. 338, 32 L.Ed. 732 (1889); Finn v. United States, 123 U.S. 227, 232–233, 8 S.Ct. 82, 31 L.Ed. 128 (1887).

In fact, in Randon v. Toby, 11 How. (52 U.S.) 493, 13 L.Ed. 784 (1850), the Court stated: "It [the waiver of the statute of limitations] extended the time of payment, and the statute did not begin to run till the extended time had expired. It operated also by way of estoppel *in pais* to a defence under the statute of limitations." 11 How. at 519. In this context the union's contention lacks merit. The union argues that its waiver was neither voluntary nor knowledgeable, basing these statements on the coercive nature of the Secretary's request (either sign or be sued) and on the fact that the Secretary misstated the date at which the 60 day period would expire. As to the first point we need only note that waivers of constitutional rights have been deemed voluntary in far more coercive situations, *e. g.*, North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (plea bargaining case). A waiver, if knowledgeably executed, is not void even though it may have been tactically motivated, as here. As to the mistaken date, this was certainly a nonmaterial mistake; we cannot believe that the union would have acted any differently had it been aware that the Secretary had another 30 days left in which he could have acted without obtaining a waiver. Reference is only needed to the number of waivers executed and the union's own argument that the challenged officers would happily sign in order to stay in office, to see the incorrectness of this position.

Finding that the exchange of letters constituted a valid waiver supported by consideration in that the Secretary forbore to sue immediately, we need not reach the question of whether or not the estoppel doctrine would also be applicable except to note our general agreement with the exposition of estoppel found in the Sixth Circuit's *Pressmen* opinion.

Finally, we must examine briefly the union's contention that the procedure here involved violates procedural due process. As noted above, the Congressional history and a Supreme Court opinion, Calhoon v. Harvey, *supra*, have emphasized the role the Secretary's discretion is to play in enforcing Title IV of the LMRDA. This discretion, limited by judicial review, has been implemented through the mechanism of obtaining these waivers in order to encourage negotiated settlements—a clear objective of Congress. The union's claim is that this process seeks to avoid the "interposition of the court" and that this is a violation of procedural due process. In addition, Local 851 notes the laxity in the Government's prosecution of this case and appeal once the decision to sue was made and urges that such dilatoriness deprives both it and the public of the "right to a meaningful hearing at a meaningful time," since the delays often allow an entirely new election to intervene.

The first of these contentions merely attacks the use of discretion on the part of any administrative or executive agency. Here, in any event, the Secretary has brought the case before the courts for a *de novo* consideration of the alleged violations of Title IV.

As to the second procedural argument, that the delay prevents a meaningful trial at a meaningful time, we must only note that the delay in this case was for 30 days in a system which has far longer delays statutorily mandated. We cannot agree with the union that a delay of this length represents a denial of due process.

On this appeal, Local 851 belatedly attempts to assert that the complaint

should have been dismissed because it failed to state a claim upon which relief could be granted. Such a claim had no part in the disposition reached by the district court. If it had we could find no merit in it for the complaint while not a blow by blow explanation of what happened during the challenged election is not required to be so under Federal procedure. The complaint adequately complies with the requirement of "a short and plain statement of the claim" which is all that is required. Rule 8 Fed.R.Civ.P.

For the reasons hereinbefore stated the dismissal of the Secretary's complaint by the district court is hereby set aside and vacated and the cause is remanded to the district court for further proceedings not inconsistent herewith.

Reversed and remanded.

STEVENS, Circuit Judge (dissenting).

This case involves a narrow issue of statutory construction. The question is whether the Secretary of Labor has acted in compliance with § 402(b) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 534, when he has delayed the commencement of litigation for more than 60 days after receipt of a meritorious complaint challenging a union election.[1]

The Secretary's practice is described, in part, in an affidavit filed on his be-

---

1. The statute provides that he shall investigate every complaint, determine its merits, and if it is meritorious, commence litigation within the 60-day period. Section 402 reads as follows:

"Sec. 402. (a) A member of a labor organization—

(1) who has exhausted the remedies available under the constitution and by-laws of such organization and of any parent body, or

(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,

may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 401 (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

(b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this title has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this title and such rules and regulations as the Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization.

(c) If, upon a preponderance of the evidence after a trial upon the merits, the court finds—

(1) that an election has not been held within the time prescribed by section 401, or

(2) that the violation of section 401 may have affected the outcome of an election,

the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization. The Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization. If the proceeding is for the removal of officers pursuant to subsection (h) of section 401, the Secretary shall certify the results of the vote and the court shall enter a decree declaring whether such persons have been removed as officers of the labor organization.

(d) An order directing an election, dismissing a complaint, or designating elected officers of a labor organization shall be appealable in the same manner as the final judgment in a civil action, but an order directing an election shall not be stayed pending appeal." 73 Stat. 534.

half in the court below. Between July 1, 1962, and June 30, 1969, the Labor Department conducted 329 investigations which disclosed actionable violations of § 401. In over half of these cases, no litigation was ever commenced; in the remainder it was the practice of the Secretary to stay his hand whenever the union expressed "the desire to consider the matter further" or "an intention to take voluntary remedial action." [2] The affidavit does not advise us how often, if ever, the Secretary filed suit within the 60-day period prescribed by § 402(b). His brief indicates, however, that extensions have frequently lasted for several months.[3]

A literal reading of the mandatory language of the statute and the regulations promulgated thereunder [4] would plainly forbid the Secretary's practice. Nevertheless, the issue must be appraised in the context of the statute as a whole, its legislative history, and the arguments which the Secretary has advanced in support of his policy of favoring negotiation rather than litigation in cases such as this. *Cf.* Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96.

## I.

As is well known, the Labor-Management Reporting and Disclosure Act was enacted to protect the rights of individual union members from overreaching by their leaders.[5] Five of the seven titles in the Act dealt with separate categories of abuse. With respect to each category, the rank and file membership comprise the primary protected class. But for each type of abuse, a somewhat different remedy was provided.

Title I is the "Bill of Rights of Members of Labor Organizations." For extreme violations of this Title, such as discipline without a fair hearing, a member has a right of direct access to a federal court to obtain injunctive or other appropriate relief without first having exhausted his internal union remedies. Detroy v. American Guild of Variety Artists, 286 F.2d 75 (2nd Cir. 1961),

---

2. The affidavit of the Acting Director of the Office of Labor-Management and Welfare-Pension Reports states, in part:

"When the labor organization indicates an intention to take voluntary remedial action, or the desire to consider the matter further before deciding whether to take such remedial action, it has been our practice to accept from such labor organization an agreement to extend the statutory sixty-day period for the filing of civil actions to set aside elections. In consideration of the waiver agreement, the Department of Labor withholds the filing of suit for the time being."

3. At pp. 22 and 23 of his brief, the Secretary identifies cases in which suit was not commenced until 141 days after the complaint had been filed; 87 days; 4 months; 116 days; and 111 days. The brief does not indicate the regularity with which the exhaustion of internal union remedies, which must precede the filing of the complaint with the Secretary, has taken the full three calendar months permitted by § 402(a) (2).

4. "[I]f the Secretary finds probable cause to believe that a violation has occurred

and has not been remedied, he is *directed* to bring, within 60 days after the complaint has been filed, a civil action against the labor organization in a Federal district court." 29 C.F.R. § 452.16(a). (Emphasis added.)

In view of the inconsistencies between the Secretary's pronouncement and his practice, I am not sure what weight, in this instance, should be accorded the regulation.

5. See, *e. g.*, the finding by Congress in § 2(b) of the statute, 73 Stat. 519:

"(b) The Congress further finds, from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives."

cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388.

Title II imposes detailed reporting and disclosure requirements on union officers as well as unions and employers. Individual members are given a right of access to the reported information, but no express remedy for a violation of the reporting requirements. Such violations are subject to criminal sanctions (§ 209) and to civil remedies in an action which may be brought by the Secretary of Labor (§ 210). However, there is no mandate to the Secretary that he "shall" proceed against Title II violations; § 210 provides that "the Secretary may bring a civil action for such relief (including injunctions) as may be appropriate." 73 Stat. 530.

Title III regulates the establishment and administration of trusteeships over local unions. Alternative remedies for violation of its provisions are authorized by § 304. Neither alternative is conditioned upon the exhaustion of internal remedies. A member may file a written complaint with the Secretary, who then "shall investigate," and if he finds that the complaint has merit "he shall, without disclosing the identity of the complainant, bring a civil action . . . for such relief . . . as may be appropriate." 73 Stat. 531. There is no specific time in which the Secretary must act, but if he should delay or fail to take any action, the member may himself commence litigation in a federal court.[6] Thus, if a Title III complaint has merit, the member has a right to have the Secretary act, or to act himself.

Title IV concerns elections. Before discussing the remedy provided by § 402, mention should be made of Title V, which deals with the fiduciary responsibility of union officers. The remedy there provided in addition to criminal sanctions, is that if a union board fails or refuses to sue a defaulting officer, any member may file suit in his own name on behalf of the union. Thus, again, the individual's direct access to the courts is protected.

The remedy for a violation of Title IV is unique. Although the rights protected by Title IV are obviously of vital importance in achieving the objectives of free and democratic union elections,[7] the procedure available to a defeated candidate or dissident member is rigidly defined. He must first exhaust the remedies available under the constitution and by-laws of the union local and of any national or international body of which it is a part. After exhausting such remedies, or if three calendar months pass without a final response to a request for intraunion relief, the member then has a statutory right to file a complaint with the Secretary of Labor "within one calendar month." This is the only right granted to an individual union member aggrieved by a violation of Title IV. But the invocation of that right gives rise to a series of statutory commands addressed first to the Secretary and, if there is merit to the complaint, ultimately to the judiciary.

First, "the Secretary shall investigate such complaint." If he determines that it is without merit, or that the alleged violation has been remedied, that is the end of the matter. The Secretary then has no further duty to act and the member has no statutory remedy of any kind.

If, however, the Secretary finds probable cause to believe that a violation of Title IV has occurred and has not been remedied, "he shall within sixty days

---

6. "Any member or subordinate body of a labor organization affected by any violation of this title (except section 301) may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate." 73 Stat. 531.

7. See Congress's statement of findings, purposes and policy in § 2 of the Act, 73 Stat. 519. See also S.Rep. 187 (86th Cong. 1st Sess.), 1959 U.S.Code Cong. & Adm.News, pp. 2318, 2322, 2336; H.Rep. 741 (86th Cong. 1st Sess.), 1959 U.S. Code Cong. & Admin.News, pp. 2424, 2438.

after the filing of the complaint bring a civil action . . . to set aside the invalid election."

Finally, if after a trial a court finds that an election has not been held within the prescribed time, or that a violation of § 401 may have affected its outcome, "the court shall declare the election, if any, to be void and direct the conduct of a new election under the supervision of the Secretary." Such an order "shall not be stayed pending appeal."

The form of the remedial provision in Title IV thus differs from the remedies authorized by other titles in several respects. First, only one statutory remedy is provided; there is no provision for criminal sanctions or for direct access to the courts by an aggrieved party. Second, the repeated use of mandatory language in describing not only the Secretary's duty to investigate and his duty to litigate, but also the remedy which the court is directed to impose, is not matched in other titles. Third, a rigid timetable is imposed on the complainant and the Secretary. Presumably, an individual member's failure to invoke a union remedy within the time specified in the by-laws, or a failure to file a complaint with the Secretary within one month from the union's denial of relief,

would be fatal.[8] The 60-day limit on the Secretary's time to investigate and the prohibition against a court stay pending appeal, also stress the urgency and rigidity of the timetable. Finally, unlike other remedial provisions authorizing such relief as may be appropriate, the single remedy specified in § 402(c) is that the tainted election shall be set aside and· a new election shall be conducted. See Wirtz v. Local 153, Glass Bottle Blowers, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705.

The structure of the entire statute strongly suggests that the mandatory language used in § 402 was deliberately selected by Congress.[9]

## II.

Two aspects of the legislative history of § 402 are important. First, the requirement of action within 60 days was not inserted for the sole benefit of the officers who won the disputed election; it was also intended to ensure prompt vindication of a meritorious claim for the benefit of the dissident members as well as the general public. And second, the changes in the form of the bill as introduced and amended in 1958, together with the comments of interested legislators, plainly demonstrate that those clos-

8. "Since time is of the essence, no complaint may be entertained which is filed more than 1 month after the union has denied a remedy or the 3-month period has expired." S.Rep. 187 (86th Cong., 1st Sess.), 1959 U.S.Code Cong. & Adm. News, pp. 2318, 2337.

9. This interpretation is confirmed by the repeated use of the word "shall" in § 402 itself. Thus, in the statement that the Secretary "shall investigate," the word "shall" is clearly mandatory.
   "The Secretary is *directed* to investigate the complaint and determine whether there is probable cause. . . ." S.Rep. 187 (86th Cong., 1st Sess.), 1959 U.S.Code Cong. & Adm.News, pp. 2318, 2337. (Emphasis added.)
   And in the statement "the court shall declare the election . . . void and direct the conduct of a new election," the word "shall" has been construed by the Supreme Court as mandatory. Wirtz v.

Local 153, Glass Bottle Blowers, 389 U. S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705. Although the same word may have different meanings in different sections of a statute if the context so requires, SEC v. National Securities, Inc., 393 U.S. 453, 466, 89 S.Ct. 564, 21 L.Ed.2d 668, it would be most unusual to interpret the same word differently in the same section. Cf. United States v. Stonehouse, 452 F.2d 455, p. 456, 457 (7th Cir. 1971). The Department of Labor itself consistently interprets the word "shall" as mandatory each time it is used in § 402. In 29 C.F.R. § 452.16(a), "shall investigate" is interpreted as "is required to investigate"; the "shall, within sixty days . . ., bring a civil action" is interpreted as "is directed to bring, within 60 days . . ., a civil action"; and the "shall declare the election . . . void and direct the conduct of a new election" is interpreted in those very words.

est to its enactment unquestionably believed that the Secretary was required to act within 60 days if he was to act at all.

We appropriately begin with a consideration of the bill as introduced in 1958.[10] As originally drafted, and as reported by the Senate Committee, S. 3974 would have required "the completion of any investigation of violation and the institution of a civil action to set aside an election, all within 30 days from the date a complaint is filed." [11] It was recognized that such a short period might not be adequate to enable the Secretary to complete his investigation. Accordingly, Senator Smith proposed an amendment providing that the action

shall be brought within 30 days "or as soon thereafter as possible." The Senator explained the purpose of the amendment:

"If the investigation necessary to determine probable cause for believing a violation has occurred should require too long a period to permit institution of an action with 30 days, *no remedy would be provided for a violation of title* [*IV*]. To correct this technical deficiency, the amendment provides that action shall be brought within 30 days after the complaint is filed, or as soon thereafter as possible." (Emphasis added.)[12]

If that language had been enacted into law, there would have been no cut-off on

10. The 1959 Act originated with S. 1555 in 1959. The Senate Report indicates directly that S. 1555 was based on S. 3974, the 1958 bill which passed the Senate. S.Rep. 187 (86th Cong., 1st Sess.), 1959 U.S.Code Cong. & Adm.News, p. 2318. In addition, the language of Act itself is so similar to the 1958 bill that it could not be read otherwise than as based upon the 1958 bill. Section 402 of the Act is nearly identical in language to the corresponding § 302 of the 1958 bill. The changes made were obviously minor refinements on the language. The sole changes were:

(1) In § 402(a) (2), the first parenthetical originally read, "including violation of the constitution and bylaws of the labor organization." It was clarified by adding the words, "pertaining to the election and removal of officers."

(2) In § 402(b), the original cumbersome language, "within thirty days of filing of such complaint, or as soon thereafter as possible but in no event after sixty days," was shortened to read "within sixty days after the filing of such complaint." There is no evidence to indicate the legislators understood "within" in "within sixty days" as meaning anything different than "within" in "within thirty days" in the 1958 bill. As the discussion in the text indicates, there can be no doubt that "within thirty days" was understood to mean that the Secretary could not bring suit after thirty days. It is for this very reason that the 2-step amendment was made—to give the Secretary more time but then to be sure he acted before 60 days had expired. The 1959 language thus expresses the same thought as the 1958 language only in fewer words.

(3) Also in § 402(b), the language "provisions of this title" had originally read "provisions of this Act." The last sentence of § 402(b), providing that "[t]he court shall have power to take such action as it deems proper to preserve the assets of the labor organization," was moved from a prior subsection "(e)."

(4) In the portion of § 402(c) following subdivision (2), the words "which shall thereupon" in the 1958 bill were clarified to read "the court shall thereupon."

(5) The last sentence of § 402(c) was added.

(6) Section 402(d) originally provided that an order directing an election could not be appealed. The enacted section is the same except for permitting an appeal but providing that the new election shall not be stayed pending the appeal.

Given these similarities, it is certainly appropriate to begin this examination of the legislative history with the legislative discussions on the 1958 bill. Furthermore, the Department of Labor's own volume on the legislative history of the Act includes the 1958 discussions. U.S. Dept. of Labor "Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, Titles I–VI," 699–764. (Hereinafter cited as Lab.Dept.Leg. Hist.)

11. The quotation is from a comment by Senator Smith reported in 104 Cong.Rec. 11003 (June 12, 1958).

12. 104 Cong.Rec. 11003 (June 12, 1958). What is now Title IV was then Title III.

the time in which the Secretary could sue. Presumably for this reason, a few days later, after consultation with the Department of Labor, Senator Smith proposed another amendment extending the period to a maximum of 60 days.

"Mr. Smith of New Jersey. Mr. President, the change I wish to make in my amendment is in the first paragraph which was read, to add after the comma in line 2 the words 'but in no event after 60 days.'

"The Department of Labor is willing to accept that change.

"Mr. Kennedy. Mr. President—

"Mr. Smith of New Jersey. Mr. President, briefly stated, this amendment is a so-called procedure for election violations.

"Mr. Kennedy. Mr. President, it is my understanding the amendment provides that the Secretary, after a complaint is received on an election case must proceed into action within 60 days. Is my understanding correct?

"Mr. Smith of New Jersey. That is correct."[13]

When the legislation was reintroduced at the next Congress, the section had been revised to provide as § 402(b) does now, that the Secretary "shall, within 60 days after the filing of such complaint, bring a civil action."[14] In my opinion the revised language is no less mandatory than the provision in S. 3974 which directed the Secretary to file suit within 30 days "or as soon thereafter as possible, *but in no event after 60 days.*" (Emphasis added.) Since the language change was not explained, I think the most reasonable interpretation of the revision is that it represents a more concise and direct expression of the same limitation contained in the 1958 bill. I find nothing in the legislative history providing the slightest support for the view that there was a decision to qualify the requirement that "in no event" should the Secretary be allowed more than 60 days in which to bring an action. On the contrary, numerous comments on the provision clearly and consistently indicate that the legislators assumed that the Secretary was given a maximum of 60 days in which to commence litigation.[15]

13. 104 Cong.Rec. 11182 (June 14, 1958). Senator John F. Kennedy co-sponsored the original 1959 bill, S. 505, with Senator Ervin. That bill contained the same 60-day language as finally enacted in S. 1551.

14. See discussion of the changes in note 10, *supra.*

15. In a section-by-section analysis prepared for the Senate Subcommittee considering the matter, the language was interpreted:
"The Secretary is given 60 days after a complaint of a violation has been filed with him in which to bring such an action." Lab.Dept.Leg.Hist. 698.
Senator John F. Kennedy's analysis of S. 505, an earlier bill which contained the same language as S. 1555 on the point in issue, was:
"The Secretary would be required to bring such action within 60 days after a complaint of violation has been filed with him." 105 Cong.Rec. 887 (Jan. 20, 1959).
Senator Goldwater, in comparing S. 748 with S. 505, said this of the language in issue here:

"[The] Secretary, if he has probable cause after complaint to believe a violation has occurred must within 60 days ask [the] court to set election aside. . . ." 105 Cong.Rec. 1288 (Jan. 28, 1959).
The Senate Committee report interpreted the section as providing
"that the Secretary must investigate complaints meeting the requirements of subsection (a), and if he has probable cause to believe that a violation of section 301 has occurred and has not been remedied, he shall, within 60 days of the filing of such complaint, institute an action in the U.S. district court. . . ." S.Rep. 187 (86th Cong., 1st Sess.), 1959 U.S.Code Cong. & Adm.News pp. 2318, 2365.
Senator Kennedy presented an analysis of S. 1555 as passed in the Senate. The relevant portion reads:
"The Secretary would be required to bring such action within 60 days after a complaint of violation has been filed with him." 105 Cong.Rec. 7024–5 (April 29, 1959), recorded in Lab.Dept. Leg.Hist. at 808.

When the bill passed the House, it included a provision for an independent action by the complaining member.[16] Although this provision was deleted in conference, it certainly reflects consciousness of the aggrieved party's interest in having the Secretary take prompt and effective action. The omission of this provision in the statute as finally enacted was not specifically explained, but the legislative history as a whole plainly indicates that the Secretary was expected to vindicate the complaining member's rights.

> The conferees, in accepting the Senate language, interpreted it as follows:
> "The Secretary will investigate each such complaint, and if he finds probable cause to believe that a violation of the title has occurred and has not been remedied, he will bring a civil action against the union. . . ." Conf. Rep. 1147 (86th Cong., 1st Sess.), 1959 U.S.Code Cong. & Adm.News, pp. 2503, 2507.
> Senator Goldwater's analysis of the final bill was:
> "Section 402(b) provides that the Secretary must investigate such complaint by a union member, and if he finds probable cause to believe that a violation of this title IV has occurred and has not been remedied, he must within 60 days after such complaint has been filed, bring a civil suit. . . ." 105 Cong.Rec. 19763-5 (Sept. 14, 1959), recorded in Lab.Dept.Leg. Hist. at 838.
> Thus, the various reports on the bill, as well as the views of two principal opposing spokesmen, Senator Goldwater for the administration and Senator Kennedy for the Senate majority, agree that the Secretary is both directed to investigate and directed to sue within 60 days when probable cause is found.

16. H.R. 8342, Title IV, § 402(a), text reproduced in Lab.Dept.Leg.Hist. 828. The conference report reads:
> "The House amendment differs from the Senate bill in that the members of the union, instead of the Secretary, can bring the civil action, and, therefore, there would be no investigation by the Secretary.
> "The conference substitute is the same as the Senate bill on this point." Conf. Rep.No.1147 (86th Cong., 1st Sess.), 1959 U.S.Code Cong. & Adm.News, pp. 2503, 2507.

Unquestionably the short period in which the Secretary is required to make his investigation was in part intended to terminate promptly an unfounded challenge to the elected officers. But in cases in which the complaint led to the discovery of an actionable violation, it seems equally clear that the short period served the legitimate purpose of expediting the prompt annulment of an invalid election. For the Secretary's action is the sole means by which the vital purposes of Title IV may be achieved.[17]

17. The House viewed "promptness" in action as a protection for the complaining member, not the incumbent officers. The supplemental views in the House Committee Report explained that the Committee rejected the Senate language because the House language providing for direct suit by the complainant provided a more prompt adjudication for the complaining member:
> "We strongly feel that remedy for remedy, relief accorded by the committee bill is the more efficacious. A paramount consideration in these situations is that the prompt settlement of election disputes is important to the stability of a union and the welfare of its members, and we consider it more likely that the losing faction in an election could conduct its contest more expeditiously by hiring aggressive local counsel than by undertaking a trek to Washington to secure the services of the Secretary as plaintiff and moving party." H.Rep.741 (86th Cong., 1st Sess.), 1959 U.S.Code Cong. & Adm.News, pp. 2424, 2478.
The fact that the House eventually conceded in requiring action through the Secretary is no indication whatever that the basic philosophy of providing the complainant with a prompt adjudication was conceded. The contrary, in fact, was true. The Senate language protected the right to prompt adjudication even though it required acting through the Secretary. The Senate bill reduced the time for exhaustion of internal union remedies from 6 months in the House version to 3 months. Added were 1 month in which to file a complaint with the Secretary and 60 days within which the Secretary must act. It is unlikely to have been merely coincidental that both bills gave the meritorious complainant an opportunity for a day in court at his initiative, either directly or through the Secretary,

In sum, the history persuades me that Congress deliberately used mandatory language in § 402, and that the command to the Secretary to act promptly was not simply intended to provide an early repose for officers whose right to represent the membership rested on a dubious foundation. I believe the 60-day period was intended to serve the public interest in obtaining swift and specific relief.

### III.

Against this background I turn to the three arguments which the Secretary has advanced in support of his right to wait more than 60 days to file suit.

### A.

First, he contends that even if the statutory admonition is mandatory, in exceptional cases the doctrines of estoppel and waiver should preclude the defendant from disavowing an agreement made to induce the Secretary to forebear litigating for more than 60 days. The Sixth Circuit, in a carefully considered opinion, accepted this argument. Hodgson v. International Printing Pressmen and Assistants Union of North America, AFL–CIO, 440 F.2d 1113, cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971). With all respect, I believe the argument is foreclosed if proper deference is given to the expressed intent of Congress, and, in any event, should fail

because it permits the Secretary to disguise his general practice in the clothing of an exceptional case. His affidavit plainly indicates that waiver agreements are routinely made. We, therefore, have more than a mere possibility that a recognized exception may expand sufficiently to swallow the general rule; the facts of record indicate that it already has done so.

Inequitable conduct or an express waiver agreement may appropriately toll a statute of limitations which is primarily designed to assure fairness to defendants.[18] But if the time specified in the statute is intended to achieve an affirmative legislative purpose, rather than merely to provide an expiration date for a contingent liability, "rigid adherence to the statutory scheme" is of greater importance than an inequitable result in a particular case. Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 361, 64 S.Ct. 128, 131, 88 L.Ed. 96.

In that case, the defendant, by asserting a desire to investigate the claim and expressly agreeing not to plead the defense of limitations, induced the carrier to withhold suit until after the statute had run. Nevertheless, the Supreme Court's analysis of the policies underlying the timeliness requirement imposed by § 16 of the Interstate Commerce Act persuasively demonstrated that it was

within a maximum of 6 months. Under the House provision he could delay filing his suit, but, since his initiative in making that decision was taken away from him in the Senate version, it was only reasonable that some provision be substituted to prevent his rights from being neglected even when he wanted to pursue them. Thus, the 60-day requirement ensures that the *complainant* with a meritorious claim will get his day in court no later than when he could have had it by his own action under the House bill.

18. "Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disap-

peared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and. that the right to be free of stale claims in time comes to prevail over the right to prosecute them.' Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348–349, [64 S.Ct. 582, 586, 88 L.Ed. 788]. Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.

"This policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights." Burnett v. New York Central Railroad Co., 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941.

not merely a statute of repose and, therefore, that the statutory bar could not be waived. The Court's decision rested on its identification of the fact that the "paramount policy of Section 16 is to secure promptness in collection."[19]

The analogy to a normal statute of repose was inapplicable to § 16 of the Interstate Commerce Act because that provision was not enacted for the sole benefit of the defendant. It also imposed an affirmative obligation on the carrier to take prompt action to effect collection. So here, § 402(b) may not fairly be considered a mere statute of repose. On the contrary, as I construe its purpose, it is a command to prompt and vigorous action. Assuming that my mandatory construction is correct, the Secretary cannot properly avoid his own duty to act by placing the responsibility for his delay on the shoulders of the defendant.[20] I do not believe the statute can at once be construed as mandatory and also as subject to such easy evasion. In effect, I believe the Secretary has inappropriately applied a "statute of limitations" label to the 60-day timeliness requirement and then invoked doctrines that suit that label but do not fit this statute.

### B.

Second, the Secretary argues that Congress must be aware of his practice and could readily have amended § 402 if it did not approve of his construction of the statute. The argument rests on an oversimplified assessment of the legislative process. Section 402 was a part of a major piece of legislation in a highly controversial area. It was the end product of lengthy hearings and extensive debate and compromise in which powerful voices made themselves heard. To change even one aspect of such a complex product may not be an easy task.

Congress does not sit as a single-minded watchdog ready to bark out a clarifying amendment at every departure from its command. It is more like a slumbering army; when aroused it has power to march where it will. One who desires to direct its attention to a specific problem must not only have a strong reason to do so, but also must be willing to risk the consequences of unanticipated action. An interpretation of a provision in the controversial and integrated statute which finally emerged from the legislative process in 1959 cannot fairly be predicated on unexplained inaction by different Congresses in subsequent years.

### C.

Finally, the Secretary argues that his practice is supported by a legislative purpose to foster negotiated settlement of electoral disputes. Language which the Supreme Court used to explain its denial of preelection relief in Calhoon v. Harvey, 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190,[21] appears to sup-

---

19. 320 U.S. at 367, 64 S.Ct. at 133. The Court went on to note that hardship to the particular litigant involved was not of controlling importance.

   "We are not unmindful of the hardship to respondent in the special circumstances, though petitioner asserts it would suffer equal hardship if the decision were the other way. Nor do we ignore the strong equitable considerations which, in relation to other types of legislation not so permeated with provisions and policies for protecting the general public interest, might move against denying effect to such an agreement."

20. Since a major purpose of the timeliness requirement in § 402(b) is to assure prompt vindication of the rights of the "real" plaintiffs, even if waivers were to be permitted, the Secretary should be required to obtain a waiver from all interested parties, not just from those who have nothing to lose by delaying the challenge to their status.

21. "Section 402 of Title IV, as has been pointed out, sets up an exclusive method for protecting Title IV rights, by permitting an individual member to file a complaint with the Secretary of Labor challenging the validity of any election because of violations of Title IV. Upon complaint the Secretary investigates and if he finds probable cause to believe that Title IV has been violated, he may file suit in the appropriate district court. It is apparent that Congress decided to tilize the special knowledge and dis-

port this argument because it indicates that the Secretary has broad discretion in deciding whether or not to file suit. That language, however, was not concerned with the timeliness requirement of § 402(b); the Court's use of the word "may" instead of "must" was then appropriate because it had not yet decided that proof of a Title IV violation might also satisfy the additional requirement of probable impact on the outcome of the election.[22] Since the precise question presented by this case was not before the Court for decision in *Calhoon,* I believe it is appropriate to identify the narrow area of discretion which is committed to the Secretary by § 402.

Title IV gives him no discretionary authority to conduct investigations or to commence litigation on his own initiative. *Cf.* Hodgson v. Local Union 6799, United Steelworkers, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510. He may only act in response to a complaint, and when a complaint is received, he must conduct an investigation. He also is under a duty to conclude that investigation within 60 days, a period which the Department of Labor accepted as adequate when this provision was under consideration by the Senate.[23] The evaluation of the facts disclosed by the investigation is, of course, a matter for the special expertise of the Secretary of Labor.

He may exercise discretion in determining whether or not a violation of Title IV has occurred and also whether the violation may have affected the outcome of an election. In the latter area, however, his problem has been simplified by the Supreme Court decision that any violation constitutes *prima facie* proof that the election results were tainted. Wirtz v. Hotel, Motel and Club Employees Union, Local 6, 391 U.S. 492, 505–509, 88 S.Ct. 1743, 20 L.Ed.2d 763.

The statute does not give either the court or the Secretary any discretion with respect to the form of remedy that is appropriate after a violation has been found. Mere prohibition of future wrongdoing does not satisfy the statutory mandate; even if another unsupervised election has been held in the interim, a new election is nonetheless required. Wirtz v. Local 153, Glass Bottle Blowers, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705.

Although the only area in which § 402 expressly contemplates that the Secretary should exercise discretion is in connection with his finding of a probable violation and its impact on the election results, the electoral process is sufficiently complex that there are no doubt matters which are a proper subject of negotiation. The heart of the Secretary's argument on this appeal is that his ability to conduct these negotiations effectively will somehow be compromised by a mandatory construction of the 60-day filing requirement.

The Secretary contends that his informal disposition of 175 cases in which actual violations were found demonstrates the wisdom of his policy of negotiation rather than litigation. He does not advise us, however, whether these cases resulted in holding new, supervised elections, as the statute requires. Nor does he indicate how many of these cases were terminated within the 60-day period, or whether any settlement would have been frustrated by filing a timely complaint.

The record indicates that even though extensions have been the rule rather than the exception, delays have generally been relatively short—the longest specifically identified having been for less than five months. But it must be remembered that delays negotiated between the Secretary and the union are added to the period in which union remedies are first exhausted, as well as to the statutory 60-day period. Even if we

---

cretion of the Secretary of Labor in order best to serve the public interest. Cf. San Diego Building Trades Council, [Millmen's Union, Local 2020] v. Garmon, 359 U.S. 236, 242 [79 S.Ct. 773, 778, 3 L.Ed.2d 775, 781]."

**22.** See Wirtz v. Hotel, Motel and Club Employees Union, Local 6, 391 U.S. 492, 505–509, 88 S.Ct. 1743, 20 L.Ed.2d 763, decided 3½ years later.

**23.** See text at n. 13, *supra.*

assume that dedicated diligence has characterized the Secretary's administration to date, we must keep in mind the long-range potential of the rule of law at issue. The lessons of history teach us that the dedication of the eager new administrator may eventually be replaced by the malaise of the bureaucrat who acts no faster and no more often than is absolutely necessary.[24]

As a practical matter there is no reason why the filing of a complaint need terminate settlement negotiations. On the contrary, the court's participation may be helpful; experience demonstrates that activity and deadlines are a greater spur to meaningful negotiations than inaction and agreed continuances.

Of greater importance is a proper identification of the interests which are the subject matter of negotiation. Once the Secretary has found an actionable violation, the dissident member is entitled to relief. Although he is the aggrieved party in the particular dispute, and is a member of the class for whose benefit the statute was enacted, he has no standing to participate in the negotiations.[25] Indeed, if the complainant is a member of some small outlying local, it is not inconceivable that his special problems may be obscured by broader issues under discussion between the Secretary of Labor and the leaders of an international union of which the local is but a tiny fragment. In this very case, although the dispute arose in a Joliet local, the agreement to delay litigation pending discussion was executed by an officer of the international as well as an officer of the local.

I am not persuaded that compliance with the statutory timeliness requirement would undermine the Secretary's ability to conduct effective negotiations, and I do not believe that an aggrieved party who has launched a valid attack on the establishment should be made to stand idly by while negotiations are carried on between the Secretary of Labor and the entrenched union leadership. The dissident with a valid claim has a statutory right to have judicial proceedings commenced within the time prescribed by Congress.

To vindicate that right it would be necessary to sustain the union's inequitable defense in this case. But the dissident may renew his attack after the next election (which might already have taken place while the Secretary was negotiating anyway), and, as the 1943 decision in Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96 teaches us, in the long run rigid adherence to the statutory scheme is of greater importance than the avoidance of an unfair result in a specific case.

IV.

Two final points remain. The Secretary suggests (1) that it is important that he be permitted more than 60 days to conclude an investigation which is impeded by union recalcitrance, and (2) that the granting of short continuances is not, after all, a matter of grave importance. As to the first point, the recalcitrance itself should provide sufficient cause to justify the filing of a timely complaint which may be dismissed or amended after the completion of discov-

---

24. The text of the waiver agreement suggests that the Secretary has already drafted a standard form of letter to implement his routine practice.

25. The answer to the question whether he has standing to intervene in the litigation when dissatisfied with the Secretary's alleged lack of diligent prosecution, see Stein v. Wirtz, 366 F.2d 188 (10th Cir. 1966), cert. denied, 386 U.S. 996, 87 S.Ct. 1316, 18 L.Ed.2d 344 and Hodgson v. United Mineworkers, 51 F.R.D. 270 (D.D.C.1970), aff'd, 77 L.R.R.M. 2496

(D.C. Cir. 1971), cert. granted, sub nom. Trbovich v. Hodgson, 40 U.S.L.W. 3174 (Oct. 19, 1971), does not affect the issue before us. For if the complainant has a right to intervene, it is all the more important that the Secretary be required to file his action, since with no litigation on file, the right to intervene would be meaningless. On the other hand, if there is no right to intervene and, therefore, the complainant's sole remedy is reliance on the Secretary, then the Secretary's diligence is vital if the congressional purpose is to be achieved.

ery. As to the second, I would suggest that it is issues like this that really determine whether Congress will remain a viable institution. For if in the day-to-day business of government the Executive is permitted to substitute his ideas of expedience for policy determinations unambiguously expressed by Congress, larger issues will routinely be decided without regard to our basic constitutional scheme.[26]

I would require the Secretary to obey the command of Congress. I respectfully dissent.

Seitz, Chief Judge, concurred in part and dissented in part and filed opinion.

---

26. "But the essence of the scheme remains, that by dividing governmental authority among three branches there was to be not only separation of powers but a system of checks and balances. Here, too, we are in danger of losing the constitutional protection sought to be afforded. Since 1933, the executive branch of the government has secured and exercised more and more power, in part by seizing it, in part by the failure of the legislative branch to assert itself.

\* \* \* \* \*

"After the 'crisis' of the Pentagon papers recedes into the past, I expect that Congress will continue to condone Presidential actions that find no warrant in Congressional legislation. We will continue, for example, to see the President wage war without Congressional declaration, to see executive orders substitute for legislation, to see secret executive agreements substitute for treaties, and to see Presidential decisions not to carry out Congressional programs under the label of 'impoundment of funds.' I suggested several years ago that the failure of Congress proves or will prove the failure of democracy. And I still think that the danger is nothing less than that." Kurland, A Comment on Separation of Power, a paper based upon a statement before the House Committee on Government Operations, June 30, 1971, published as a University of Chicago Law School "Occasional Paper."