# UNITED STATES *v.* BOARD OF COMMISSIONERS OF SHEFFIELD, ALABAMA, ET AL.

No. 76–1662.  Argued October 11, 1977—Decided March 6, 1978

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined, and in Part III of which POWELL, J., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 138. POWELL, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 139. STEVENS, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 140.

*Assistant Attorney General Days* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Allan A. Ryan, Jr., Walter W. Barnett,* and *Judith E. Wolf.*

*Vincent McAlister* argued the cause for appellees. With him on the brief was *Braxton W. Ashe.*\*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Section 5 of the Voting Rights Act of 1965 (Act), 79 Stat. 439, as amended, 42 U. S. C. § 1973c (1970 ed., Supp. V),[1]

---

\**Brian J. O'Neill, Vilma S. Martinez,* and *Joaquin G. Avila* filed a brief for the Mexican American Legal Defense and Educational Fund et al. urging reversal.

*James E. Ross* filed a brief for Westheimer Independent School District as *amicus curiae.*

[1] Section 5, as set forth in 42 U. S. C. § 1973c (1970 ed., Supp. V), provides in pertinent part:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title [§ 4 (a) of the Act, 79 Stat. 438, as amended], based upon determinations made under the first sentence of section 1973b (b) of this title [§ 4 (b) of the Act, 79 Stat. 438, as amended], are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure

requires that States, like Alabama, which are covered under § 4 of the Act, 79 Stat. 438, as amended, 42 U. S. C. § 1973b (1970 ed., Supp. V),[2] obtain prior federal approval before changing any voting practice or procedure that was in effect on November 1, 1964. The questions for decision in this case are (1) whether § 5 requires an Alabama city that has never conducted voter registration [3] to obtain preclearance of a voting change and (2), if so, whether the failure of the Attorney

with respect to voting different from that in force or effect on November 1, 1964, . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, . . . and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. . . ."

[2] Pursuant to the first sentence of § 4 (b), Alabama was designated as a covered jurisdiction on August 6, 1965, 30 Fed. Reg. 9897, it having been determined that Alabama maintained a "test or device" on November 1, 1964, and that "less than 50 per centum of [those] persons of voting age residing [in Alabama] were registered on November 1, 1964, or . . . voted in [the 1964 Presidential election]." 79 Stat. 438, as amended, 42 U. S. C. § 1973b (b) (1970 ed., Supp. V). Because Alabama has not established in a judicial proceeding that the voter qualification requirements had not been used for the purpose or with the effect of denying or abridging the right to vote on account of race, it is subject to the prohibitions of § 4 (a), see 42 U. S. C. § 1973b (a) (1970 ed., Supp. V), and hence to § 5.

[3] In Alabama, voter registration is conducted by county boards, the members of which are appointed by specified state officials. See Ala. Code, Tit. 17, § 17-4-40 (1977).

General of the United States to object to the holding of a referendum election at which a change is adopted constitutes federal approval of that change.

I

The city of Sheffield, Ala. (City or Sheffield), was incorporated in 1885 by the Alabama Legislature. As incorporated, the City was governed by a mayor and eight councilmen, two councilmen being elected directly from each · of the City's four wards. Sheffield retained this mayor-council government until 1912 when it adopted a system in which three commissioners, elected by the City at large, ran the City. This commission form of government was in effect in Sheffield on November 1, 1964.

Sometime prior to March 20, 1975, Sheffield decided to put to a referendum the question whether the City should return to a mayor-council form of government.[4] On that date the president of the Board of Commissioners of Sheffield wrote the Attorney General of the United States to "give notice of the proposal of submitting to the qualified voters of the City, whether the present commission form of government shall be abandoned in favor of the Mayor and Alderman form of government." [5] On May 13, 1975, before the Attorney General

---

[4] The record reflects that the citizens of Sheffield had been considering this change for some time. During the late 1960's, the City wrote the Attorney General of Alabama and raised a number of questions concerning the procedures and mechanics for adopting a mayor-council form of government. The Alabama Attorney General's reply, which took the form of an opinion letter, advised what procedures would have to be followed to effect such a change and informed the City that if the electorate voted to abandon the commission form of government Sheffield would return to the aldermanic form of government "as it existed . . . at the time the commission form of government was adopted."

[5] The letter provided that the mechanics of the proposed referendum were governed by Art. 3 of Title 37 of the Code of Alabama—by which the City presumably meant Art. 3 of Chapter 4 of Title 37, now Ala. Code,

replied, the referendum occurred, and the voters of Sheffield approved the change.

On May 23, the Attorney Genearl formally responded to Sheffield that he did "not interpose an objection to the holding of the referendum," but that "[s]ince voters in the City of Sheffield elected to adopt the mayor-council form of government on May 13, 1975, the change is also subject to the preclearance requirements of Section 5." The Attorney General's letter also stated that in the event the City should elect to seek preclearance of the change from the Attorney General it should submit detailed information concerning the change, including a description of "the aldermanic form of government which existed in 1912 and the method by which it was elected, *i. e.*, the number of aldermen, the terms and qualifications for the mayor and aldermen, whether the aldermen were elected at large or by wards, whether there were numbered post, residency, majority vote or staggered term requirements for the aldermanic seats, and whether single shot voting was prohibited."

Thereafter the City informed the Attorney General that the proposed change would divide the City into four wards of substantially equal population, that each ward would have two council seats, that councilmen from each ward would be elected at large, and that candidates would run for numbered places. Subsequently the City furnished a detailed map showing ward boundaries, data concerning the population distribution by race for each ward, and a history of black candidacy for city and county offices since 1965. The City's submission was completed on May 5, 1976.

On July 6, 1976, the Attorney General notified the City

---

Tit. 11, § 11-44-150 *et seq.* (1977)—that "[p]resent existing voting wards are not changed at the time of voting (but may be equitably adjusted at a later date)"—as they in fact were—and that "if the present commission type is abandoned, the [mayor-aldermanic form that existed in 1912] would automatically be reinstated."

that while he did not "interpose any objection to the change to a mayor-council form of government . . . to the proposed district lines or to the at-large election of the mayor and the president of the council," he did object to the implementation of the proposed at-large method of electing city councilmen because he was "unable to conclude that the at-large election of councilmen required to reside in districts will not have a racially discriminatory effect."

Notwithstanding the Attorney General's objection, the City scheduled an at-large council election for August 10, 1976. On August 9, the United States instituted this suit in the District Court for the Northern District of Alabama to enforce its § 5 objection. A temporary restraining order was denied. After the election was held, a three-judge court was convened and that court dismissed the suit. 430 F. Supp. 786 (1977). The District Court unanimously held [6] that Sheffield was not covered by § 5 because it is not a "political subdivision" as that term is defined in § 14 (c)(2) of the Act, 79 Stat. 445, 42 U. S. C. § 1973$l$ (c)(2), which provides that " 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting." See 430 F. Supp., at 788–789 and 790–792. The court also held, one judge dissenting, that "by approving the referendum the Attorney General in fact approved the change to the Mayor-Council form of government [in which aldermen were elected at large] notwithstanding [his statement] to the City that the change was also subject to pre-clearance." *Id.,*

---

[6] The court initially decided the case on the ground that the Attorney General's July 6, 1976, objection was one day out of time and hence ineffective. However, on petition for rehearing the court found that, because July 5, 1976, was a federal holiday, the July 6 objection was timely. See 430 F. Supp., at 787. The court then considered the other grounds, discussed *infra.*

at 789. The court reasoned that the approval of the referendum constituted clearance of those aspects of the proposed change that the Attorney General knew or should have known would be implemented if the referendum passed and that he should have known that Sheffield would be obliged to follow Ala. Code § 11–43–40 (1975)—formerly Ala. Code, Tit. 37, § 426 (Supp. 1973)—which requires the at-large election of aldermen in cities, like Sheffield, with populations of less than 20,000. 430 F. Supp., at 789–790. We noted probable jurisdiction. 433 U. S. 906 (1977). We reverse.

## II

We first consider whether Congress intended to exclude from § 5 coverage political units, like Sheffield, which have never conducted voter registration. In concluding that Congress did, the District Court noted that § 5 applies to "a [designated] state or a [designated] *political subdivision*" and construed § 5 to provide that, where a State in its entirety has been designated for coverage, the only political units within it that are subject to § 5 are those that are "political subdivisions" within the meaning of § 14 (c)(2). Because § 14 (c) (2) refers only to counties and to the units of state government that register voters, the District Court held that political units like the City are not subject to the duties imposed by § 5.

There is abundant evidence that the District Court's interpretation of the Act is contrary to the congressional intent. First, and most significantly, the District Court's construction is inconsistent with the Act's structure, makes § 5 coverage depend upon a factor completely irrelevant to the Act's purposes, and thereby permits precisely the kind of circumvention of congressional policy that § 5 was designed to prevent. Second, the language of the Act does not require such a crippling interpretation, but rather is susceptible of a reading that will fully implement the congressional objectives. Finally,

the District Court's construction is flatly inconsistent with the Attorney General's consistent interpretations of § 5 and with the legislative history of its enactment and re-enactments. The language, structure, history, and purposes of the Act persuade us that § 5, like the constitutional provisions it is designed to implement, applies to all entities having power over any aspect of the electoral process within designated jurisdictions, not only to counties or to whatever units of state government perform the function of registering voters.

## A

Although this Court has described the workings of the Voting Rights Act in prior cases, see, *e. g., Allen* v. *State Board of Elections,* 393 U. S. 544 (1969); *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), it is appropriate again to summarize its purposes and structure and the special function of § 5. Congress adopted the Act in 1965 to implement the Fifteenth Amendment and erase the blight of racial discrimination in voting. See 383 U. S., at 308. The core of the Act "is a complex scheme of stringent remedies aimed at areas where voting discrimination has been the most flagrant." *Id.,* at 315. Congress resorted to these stern measures because experience had shown them to be necessary to eradicate the "insidious and pervasive evil of [racial discrimination in voting] that had been perpetuated in certain parts of our country." *Id.,* at 309. Earlier efforts to end this discrimination by facilitating case-by-case litigation had proved ineffective in large part because voting suits had been "unusually onerous to prepare" and "exceedingly slow" to produce results. And even when favorable decisions had been obtained, the affected jurisdictions often "merely switched to discriminatory devices not covered by the federal decrees." See *id.,* at 313–314.

The structure and operation of the Act are relatively simple.

Sections 4 (a) [7] and 4 (b) [8] determine the jurisdictions that are subject to the Act's special measures. Congress, having found that there was a high probability of pervasive racial discrimination in voting in areas that employed literacy tests or similar voting qualifications and that, in addition, had low voter turnouts or registration figures, provided that coverage in a State is "triggered" if it maintained any "test or device" [9] on a specified date and if it had voter registration or voter turnout

[7] Section 4 (a), as set forth in 42 U. S. C. § 1973b (a) (1970 ed., Supp. V), provides in pertinent part:

"To assure that the right of citi[z]ens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under the first two sentences of subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the seventeen years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color . . . ."

[8] In pertinent part, § 4 (b), as set forth in 42 U. S. C. § 1973b (b) (1970 ed., Supp. V), provides:

"The provisions of subsection (a) of this section [§ 4 (a)] shall apply in any State or in any political subdivision of a State which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964."

[9] Section 4 (c) of the Act defines "test or device" to "mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 79 Stat. 438, 42 U. S. C. § 1973b (c).

of less than 50% of those of voting age during specified Presidential elections. When this formula is not met in an entire State, coverage is triggered in any "political subdivision" within the State that satisfies the formula. Since § 4 (c) of the Act defines "test or device" as a "prerequisite for *voting or registration* for voting," 79 Stat. 438, 42 U. S. C. § 1973b (c) (emphasis supplied), it is clear that the Attorney General, in making a coverage determination, is to consider not only the voter registration process within a jurisdiction, but also the procedures followed by the election officials at the polling places. A State or political subdivision which does not use literacy tests to determine who may register to vote but employs such tests at the polling places to determine who may cast a ballot may plainly be covered under § 4 (b).

If designated under § 4 (b), a jurisdiction will become subject to the Act's special remedies unless it establishes, in a judicial action, that no "test or device" was used to discriminate on the basis of race in voting.` Section 4 (a) is one of the Act's core remedial provisions. Because Congress determined that the continued employment of literacy tests and similar devices in covered areas would perpetuate racial discrimination, it suspended their use in § 4 (a). Just as the actions of every political unit that conducts elections are relevant under § 4 (b), so § 4 (a) imposes a duty on every entity in the covered jurisdictions having power over the electoral process, whether or not the entity registers voters. That § 4 (a) has this geographic reach is clear both from the fact that a "test or device" may be employed by any official with control over any aspect of an election and from § 4 (a)'s provision that its suspension operates *"in* any [designated] State . . . or *in* any [designated] political subdivision." (Emphasis supplied.) The congressional objectives plainly required that § 4 (a) apply throughout each designated jurisdiction.[10] If it did not have this scope, the covered States,

---

[10] The 1975 amendments to the Act eliminate any question but that

which in the past had been so ingenious in their defiance of the spirit of federal law, could have easily circumvented § 4 (a) by, *e. g.*, discontinuing the use of literacy tests to determine who may register but requiring that all citizens pass literacy tests at the polling places before voting.

Although § 4 (a) is a potent weapon, Congress recognized that it alone would not ensure an end to racial discrimination in voting in covered areas. In the past, States and the political units within them had responded to federal decrees outlawing discriminatory practices by "resort[ing] to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination . . . ." *South Carolina* v. *Katzenbach*, 383 U. S., at 335. To prevent any future circumvention of constitutional policy, Congress adopted § 5 which provides that whenever a designated State or political subdivision wishes to change its voting laws, it must first demonstrate to a federal instrumentality that the change will be nondiscriminatory. By freezing each covered jurisdiction's election procedures, Congress shifted the advantages of time and inertia from the perpetrators of the evil to its victims.

The foregoing discussion of the key remedial provisions of the Act belies the District Court's conclusion that § 5 should apply only to counties and to the political units that conduct

─────────────

§ 4 (a)'s prohibition has to apply to all political units within designated jurisdictions. Since these amendments provide that, as to jurisdictions that are considered for coverage because they had low voter turnout or registration in the November 1972 election, the phrase "test or device" includes "any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, only in the English language, where the Director of the Census determines that more than five per centum of the citizens of voting age residing in such State or political subdivision are members of a single language minority[,]" 89 Stat. 401, 42 U. S. C. § 1973b (f)(3) (1970 ed., Supp. V), it is indisputable that Congress contemplated that the suspension of tests and devices would apply to local officials other than those employed by counties or by the functional units of state government that conduct voter registration.

voter registration. As is apparent from the Act, § 5 "was structured to assure the effectiveness of the dramatic step that Congress had taken in § 4" and "is clearly designed to march in lock-step with § 4 . . . ." *Allen* v. *State Board of Elections,* 393 U. S., at 584 (Harlan, J., concurring and dissenting). Since jurisdictions may be designated under § 4 (b) by reason of the actions of election officials who do not register voters, and since § 4 (a) imposes duties on all election officials whether or not they are involved in voter registration, it appears to follow necessarily that § 5 has to apply to all entities exercising control over the electoral processes within the covered States or subdivisions. In any case, in view of the structure of the Act, it would be unthinkable to adopt the District Court's construction unless there were persuasive evidence either that § 5 was intended to apply only to changes affecting the registration process or that Congress clearly manifested an intention to restrict § 5 coverage to counties or to the units of local government that register voters. But the Act supports neither conclusion.

The terms of the Act and decisions of this Court clearly indicate that § 5 was not intended to apply only to voting changes occurring within the registration process. Section 5 applies to "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting . . . ." Since the statutory definition of "voting" includes "all action necessary to make a vote effective in any . . . election, including, but not limited to, registration, . . . casting a ballot, and having such ballot counted properly . . . ," 79 Stat. 445, 42 U. S. C. § 1973*l* (c)(1), § 5's coverage of laws affecting voting is comprehensive.

The Court's decisions over the past 10 years have given § 5 the broad scope suggested by the language of the Act. We first construed it in *Allen* v. *State Board of Elections, supra.* There our examination of the Act's objectives and original legislative history led us to interpret § 5 to give it "the

broadest possible scope," 393 U. S., at 567, and to require prior federal scrutiny of "any state enactment which altered the election law in a covered State in even a minor way." *Id.*, at 566. In so construing § 5, we unanimously rejected[11]—as the plain terms of the Act would themselves have seemingly required—the argument of an appellee that § 5 should apply only to enactments affecting who may register to vote. 393 U. S., at 564. Our decisions have required federal preclearance of laws changing the location of polling places, see *Perkins* v. *Matthews*, 400 U. S. 379 (1971), laws adopting at-large systems of election, *ibid.; Fairley* v. *Patterson* (decided with *Allen, supra*); laws providing for the appointment of previously elected officials, *Bunton* v. *Patterson* (decided with *Allen, supra*); laws regulating candidacy, *Whitley* v. *Williams* (decided with *Allen, supra*); laws changing voting procedures, *Allen, supra;* annexations, *City of Richmond* v. *United States*, 422 U. S. 358 (1975); *City of Petersburg* v. *United States*, 410 U. S. 962 (1973), summarily aff'g 354 F. Supp. 1021 (DC 1972); *Perkins* v. *Matthews, supra;* and reapportionment and redistricting, *Beer* v. *United States*, 425 U. S. 130 (1976); *Georgia* v. *United States*, 411 U. S. 526 (1973); see *United . Jewish Organizations* v. *Carey*, 430 U. S. 144 (1977). In each case, federal scrutiny of the proposed change was required because the change had the potential to deny or dilute the rights conferred by § 4 (a).

Significantly, in several of these cases, this Court decided that § 5's preclearance requirement applied to cities within designated States without ever inquiring whether the cities conducted voter registration. See *Beer* v. *United States, supra; City of Richmond* v. *United States, supra; Perkins* v.

---

[11] Although both Mr. Justice Harlan and Mr. Justice Black dissented from aspects of the Court's holding in *Allen,* neither disagreed with the proposition that the statute had to be construed to cover changes occurring outside the registration process. See 393 U. S., at 591–593 (Harlan, J., concurring and dissenting); *id.*, at 595 (Black, J., dissenting).

*Matthews, supra.* It is doubtful, moreover, that § 5 would have been held to be applicable in at least one of these cases if the District Court's interpretation of § 5 were the law.[12] Although the assumption of these decisions—that cities are covered whether or not they conduct voter registration—perhaps has little *stare decisis* significance—the issue not having been raised, but see *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 307 (1962)—these decisions underscore the obvious fact that, whether or not they register voters, cities can enact measures with the potential to dilute or defeat the voting rights of minority group members, and they further illustrate that Congress could not have intended § 5's duties to apply only to those cities that register voters.

Because § 5 embodies a judgment that voting changes occurring outside the registration process have the potential to discriminate in voting on the basis of race, it would be irrational for § 5 coverage to turn on whether the political unit enacting or administering the change itself registers voters. But quite apart from the fact that this cramped construction cannot be squared with any reasonable set of objectives, the District Court's interpretation of § 5 would permit the precise evil that § 5 was designed to eliminate. Under it, local political entities like Sheffield would be free to respond to local pressure to limit the political power of minorities and take steps that would, temporarily at least, dilute or entirely defeat the voting rights of minorities, *e. g.,* providing for the appointment of officials who previously had been elected, mov-

---

[12] *City of Richmond* v. *United States,* of course, involved a city in Virginia. There voter registration, while conducted on a citywide basis, is—and was at the time of that case—performed, not by employees of the city, but by an electoral board appointed by state judges. See Va. Code 24.1, §§ 24.1-29, 24.1-43—24.1-46 (Supp. 1977). While Richmond's Electoral Board would be covered under the District Court's reading of § 5, it would seem that the city itself would not—a fact that illustrates the severe limitations that the District Court's construction would impose on the reach of § 5.

ing the polling places to areas of the city where minority group members could not safely travel, or even providing that election officials could not count the ballots of minority voters. The only recourse for the minority group members affected by such changes would be the one Congress implicitly found to be unsatisfactory: repeated litigation. See *United Jewish Organizations* v. *Carey, supra,* at 156. The District Court's reading of § 5 would thus place the advantages of time and inertia back on the perpetrators of the discrimination as to all elections conducted by political units that do not register voters, and, equally seriously, it would invite States to circumvent the Act in all other elections by allowing local entities that do not conduct voter registration to control critical aspects of the electoral process. The clear consequence of this interpretation would be to nullify both § 5 and the Act in a large number of its potential applications.[13]

---

[13] Our Brother STEVENS' dissenting opinion neither disputes that § 4 (a)'s duties apply to all political units within designated jurisdictions nor disagrees that § 5 was enacted to assure the effectiveness of § 4 (a) by preventing the contrivance of new rules to defeat newly won voting rights. But, in addition to advancing the arguments unanimously rejected by this Court in *Allen,* and by numerous decisions following it, compare *post,* at 145, with *supra,* at 122–123, the dissent argues that several congressional policies will nevertheless be promoted if cities that do not register voters remain free to concoct new measures for the sole purpose of perpetuating voting discrimination. His suggestion that Congress did not intend to cover purely local elections, *post,* at 144, overlooks both the overwhelming evidence that the Act is intended to secure the right to vote in local as well as state and national elections, see, *e. g.,* § 14 (c) (1) of the Act, 79 Stat. 445, 42 U. S. C. § 1973*l* (c) (1) (*"any primary, special,* or *general* election" is covered), and the more fundamental point that local political units that do not conduct registration may conduct or control state and national elections. Our Brother STEVENS' further suggestion that an adventitious limitation on the reach of § 5 is necessary because otherwise a deluge of trivial submissions will impair the preclearance function conjures a specter that is unsupported by the legislative record. Ironically, the statistical support for this theory is derived from the hearings conducted by a Congress that repeatedly manifested its understanding that § 5 applied to the voting changes of every

## B

The terms of the Act do not require such an absurd result. In arriving at its interpretation of § 5, the District Court focused on its language "a State or political subdivision with respect to which the prohibitions set forth in [§ 4 (a)] based upon determinations made under [§ 4 (b)] are in effect." While § 5's failure to use the phrase *"in* a [designated] State or subdivision" arguably provides a basis for an inference that § 5 ·was not intended to have the territorial reach of § 4 (a), the actual terms of § 5 suggest that its coverage is to be coterminous with § 4 (a)'s. The coverage provision of § 5 specifically refers to both § 4 (a) and § 4 (b), a fact which itself implies that § 4—not § 14 (c)(2)—is to determine the reach of § 5. And the content of § 5 supports this view. Section 5 provides that it is to apply to the jurisdictions "with respect to which" § 4 (a)'s prohibitions are in effect. Since the States or political subdivisions "with respect to which" § 4 (a)'s duties apply are entire territories and not just county governments or the units of local government that register voters, § 5 must, it would seem, apply territorially as well.

Quite apart from the fact the textual interrelationship between § 4 (a) and § 5 affirmatively suggests that § 5 is to have a territorial reach, the operative language of the statute belies any suggestion that § 14 (c)(2) limits the scope of § 5. Where, as here, a State has been designated for coverage, the meaning of the term "political subdivision" has no operative significance in determining the reach of § 5: the only question is the meaning of "[designated] State." There is no more basis in the statute or its history for treating § 14 (c)(2) as limiting the reach of § 5 than there is for treating it as limiting § 4 (a).

Broader considerations support this construction of § 5's terms. The Act, of course, is designed to implement the Fif-

political unit within each designated jurisdiction. Compare *infra*, at 133–134, with *post*, at 147–148, nn. 8–11.

teenth Amendment and, in some respects, the Fourteenth Amendment, see *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966); *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). One would expect that the substantive duties imposed in the Act, as in the constitutional provisions that it is designed to implement, would apply not only to governmental entities formally acting in the name of the State, but also to those political units that may exercise control over critical aspects of the voting process. Cf. *Hunter* v. *Erickson,* 393 U. S. 385 (1969); *Terry* v. *Adams,* 345 U. S. 461 (1953). It is, of course, the case that the term "State" does not have this meaning throughout the Act. For example, the Attorney General may not designate a city for coverage under § 4 (b) of the Act on the theory the city's actions are often "state action"; for purposes of designation, "State" refers to a specific geographic territory in its entirety. But it is clear that once a State is designated for coverage the Act's remedial provisions apply to actions that are not formally those of the State. Section 4 (a), of course, applies to all state actors, and even the legislative history relied upon by the District Court reveals the congressional understanding that the reference to "State" in § 5 includes political units within it.[14] This alone would appear sufficient reason to make § 5's preclearance requirement apply to all state action. So

_____

[14] The District Court relied upon the following excerpt from the legislative history:

"Where an entire State falls within . . . subsection [4 (b)] so does each and every political subdivision within that State." H. R. Rep. No. 439, 89th Cong., 1st Sess., 25 (1965); see S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, p. 23 (1965).

Of course, the District Court's assumption to the contrary notwithstanding, this statement does not establish that the only entities in designated States which are subject to § 5 are those that are either counties or the units that register voters. Indeed, since this statement also pertains to the scope of § 4 (a), which clearly applies to all political units within covered jurisdictions, it is difficult to see how it can be relied upon to support a crippling interpretation of § 5.

in view of the explicit textual relationship between § 4 and § 5, the irrelevance of § 14 (c)(2) to the meaning of "[designated] State," and the critical role that § 5 is to play in securing the promise of § 4 (a), it is wholly logical to interpret "State . . . with respect to which" § 4 (a) is in effect as referring to all political units within it.

Because the designated jurisdiction in this case is a State, we need not consider the question of how § 5 applies when a political subdivision is the designated entity. But we observe that a similar argument can be made concerning § 5's reference to "[designated] political subdivision," and this fact plainly supports our interpretation of § 5's parallel reference to "[designated] State." The legislative background of § 14 (c)(2)'s definition of "political subdivision" reflects that Congress intended to define "political subdivision" as areas of a nondesignated State,[15] not only as functional units or levels of government. The conclusion clearly follows that this definition was intended to operate only for purposes of determining which political units in nondesignated States may be

---

[15] The statutory terms of § 14 (c)(2)—defining subdivision as a "county or parish" or as "any other subdivision of a State which conducts registration for voting"—can obviously refer to a geographic territory, and the usages of "political subdivision" in the Act and the legislative history leave no doubt but that it is in this sense that Congress used the term. The usage "in a political subdivision," which occurs in § 4 (a) and in many other sections of the Act, see, e. g., 42 U. S. C. §§ 1973a (a)–(c) (1970 ed., Supp. V), would be nonsensical if "political subdivision" denoted only specific functional units of state government. And the legislative history eliminates any basis for doubt. Attorney General Katzenbach, whose understanding of the meaning of the term was intended to be embodied in § 14 (c)(2), see Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 121 (1965), repeatedly stated in the course of his testimony before the committees of Congress that "political subdivision" referred to areas of nondesignated States. See, e. g., id., at 21, 51, 53, and 78; Hearings on S. 1564 before the Committee on the Judiciary, 89th Cong., 1st Sess., 44 (1965).

separately designated for coverage under § 4 (b).[16]   Congress seemingly wished to ensure that just as, for example, a school board could not be separately. designated for coverage in the name of the State, so it could not be separately designated on the theory that it was a "political subdivision" of a State. By the same token, it is equally clear that Congress never intended the § 14 (c) (2) definition to limit the substantive reach of the Act's core remedial provision once an area of a nondesignated State had been determined to be covered; all state actors within designated political subdivisions are subject to § 4 (a).   In view of the fact that "political subdivision" was understood as referring to an area of the State, the fact that the Act generally is aimed at all "state action" occurring within specified areas, and the textual interrelationship between § 4 (a) and § 5, it logically follows that where a political subdivision has been separately designated for coverage under § 4, all political units within it are subject to the preclearance requirement.[17]

## C

Finally, the legislative history and other related aids to ascertaining congressional intent leave little doubt but that Congress

[16] The statutory terms support the view that the § 14 (c) (2) definition was not intended to impose any limitations on the reach of the Act outside the designation process.   Under § 14 (c) (2)'s terms, counties are "political subdivisions" whether or not they register voters.   While the automatic inclusion of counties within the definition of "political subdivision" would be difficult to square with any rational policy were § 14 (c) (2) intended to identify the governmental entities that may be subject to the Act's special duties, the inclusion can be readily explained on the assumption that the only limitation § 14 (c) (2) imposes on the Act pertains to the areas that may be designated for coverage.

[17] Our Brother STEVENS' dissent misconceives the basis for the conclusion that § 5's terms are susceptible of an interpretation under which Sheffield is covered.   We believe that the term "State" can bear a meaning that includes all state actors within it and that, given the textual interrelationship between § 5 and § 4 (a) and the related purposes of the two provisions, such a reading is a natural one.

has always—and certainly by 1975—been of the view that § 5, like § 4 (a), applies territorially and includes political units like Sheffield whether or not they conduct voter registration. The specific narrow question was not extensively discussed at the time of original enactment, but there is little, if anything, in the original legislative history that in any way supports the crippling construction of the District Court.[18] At least one statement made in the course of the debate over § 5 strongly suggests that Congress never intended to draw a distinction between cities that do and do not register voters. In support of an amendment that would have stricken § 5 from the Act, Senator Talmadge of Georgia—minutes before the Senate voted to reject his amendment—argued that the section was "far-fetched" because it would require any city which sought to enact or administer a voting change to obtain federal pre-clearance. 111 Cong. Rec. 10729 (1965). While this statement was made by an opponent of the Act, its proponents, one of whom was on the floor defending § 5 at the time of Senator Talmadge's assertion, see 111 Cong. Rec. 10728 (1965) (remarks of Sen. Tydings), did not disagree with his assessment. Thus, whatever Senator Talmadge's intentions, his statement

---

[18] Our Brother STEVENS' dissent quotes a number of statements from the legislative history of the original statute which, in his view, establish that Congress believed that § 14 (c) (2) would prevent federal interference with the affairs of "minor, local governmental units." See post, at 142–143. While these statements considered ·in isolation provide colorable support for the dissent's conclusion, the statutory background in its entirety makes it abundantly clear that these fragments from the legislative history cannot support such a broad assertion as to the congressional intent. The dissent's interpretation of these statements necessarily forces one to take a position that not even the dissent is willing to adopt (because it is flatly inconsistent with the statutory terms): i. e., that § 4 (a)'s suspension of literacy tests does not apply to minor, local governmental units. As demonstrated, see supra, at 128–129, the statements quoted in the dissent can only be understood as further support for our conclusion that Congress' exclusive objective in § 14 (c) (2) was to limit the jurisdictions which may be separately designated for coverage under § 4 (b).

possesses significant pertinence. See *Arizona* v. *California,* 373 U. S. 546, 583 n. 85 (1963).

What is perhaps a more compelling argument concerning the original, and subsequent, congressional understanding of the scope of § 5 is that the Attorney General has, since the Act was adopted in 1965, interpreted § 5 as requiring all political units in designated jurisdictions to preclear proposed voting changes.[19] This contemporaneous administrative construction of the Act is persuasive evidence of the original understanding, especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress.[20] See *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205, 210 (1972); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965) In recognition of the Attorney General's key role in the formulation of the Act, this Court in the past has given great deference to his interpretations of it. See *Perkins* v. *Mat-*

---

[19] The record reflects that between August 6, 1965, and May 1, 1977, the Attorney General received more than 8,100 proposed voting changes from political units—other than counties or parishes—that did not register voters. While our Brother Stevens' dissent is correct that few of these occurred during the first few years of the Act's existence, *post,* at 147 n. 8, it does not deny that even during these years the Attorney General received and processed submissions involving proposed changes of political units that were not counties and that did not register voters. In any case, when the Attorney General made § 5 an administrative priority, he unambiguously indicated his view that it applies to all political units in covered jurisdictions. The dissent's suggestion that the Attorney General's reading was somehow precipitated by this Court's "creative" interpretation of § 5 in *Allen* overlooks the fact that the Attorney General filed a brief in *Allen* urging the position that this Court adopted. In short, the Attorney General's administrative interpretation of § 5 is "contemporaneous" as that term is used in our decisions. See, *e. g., Nashville Gas Co.* v. *Satty,* 434 U. S. 136, 142 n. 4 (1977).

[20] See testimony of Attorney General Katzenbach, in Hearings on H. R. 6400, *supra* n. 9, at 9 *et seq.,* and testimony of Attorney General Katzenbach in Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 14 *et seq.* (1965).

_thews_, 400 U. S., at 390–394.[21] Moreover, the Attorney General's longstanding construction of § 5 was reported to Congress by Justice Department officials in connection with the 1975 extension of the Act. See testimony of Assistant Attorney General J. Stanley Pottinger at the Hearings on H. R. 939 et al. before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 1st Sess., 166 (1975) (1975 House Hearings); exhibits to the testimony of Assistant Attorney General J. Stanley Pottinger at the Hearings on S. 407 et al. before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 598–599 (1975) (1975 Senate Hearings).[22]

And the legislative history of the 1970 and 1975 re-enactments compellingly supports the conclusion that Congress shared the Attorney General's view. In 1970, Congress was clearly fully aware of this Court's interpretation of § 5 as reaching voter changes other than those affecting the registration process and plainly contemplated that the Act would continue to be so construed. See, _e. g._, Hearings on H. R. 4249 et al. before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., 1, 4, 18, 83, 130–131, 133, 147–149, 154–155, 182–184, 402–454 (1969); Hearings on S. 818 et al. before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st and 2d Sess., 48, 195–196, 369–370, 397–398, 426–427, 469

---

[21] The Attorney General's regulations also indicate his view that § 5, like § 4 (a), applies territorially: "Section 5 . . . prohibits the enforcement _in any jurisdiction covered by section 4 (a)_ [of any voting change]." 28 CFR § 51.1 (1976) (emphasis supplied).

[22] The Attorney General's statements and exhibits apprised the Congress that the Attorney General had treated cities like Sheffield as covered by § 5. See also 1975 Senate Hearings 563–564 (discussion of § 5 submission from Montgomery, Ala.), and 568 (statement of Justice Department official that there was no need to clarify the Act to make certain that city council _redistricting is covered_).

(1970). The history further suggests that Congress assumed that, just as § 5 applies to changes that affect aspects of voting other than registration, so it also applies to entities other than those which conduct voter registration. One of the principal factual arguments advanced in favor of the renewal of § 5 was that Anniston, Ala.—which, like Sheffield, has never conducted voter registration—had failed to obtain preclearance of some highly significant voting changes. See Joint View of 10 Members of the Senate Judiciary Committee Relating to the Extension of the Voting Rights Act of 1965, 116 Cong. Rec. 5521 (1970).

The congressional history is even clearer with respect to the 1975 extension, which, of course, is the legislation that controls the case at bar. Both the House and Senate Hearings on the bill reflect that the assumption that the coverage of § 5 was unlimited was widely shared and unchallenged. In addition to the aforementioned testimony of the then Assistant Attorney General, which of course has special significance, numerous witnesses expressed this view, either directly or indirectly. See, e. g., 1975 Senate Hearings 75–76 (in covered jurisdictions § 5 requires preclearance of all voting changes, and objections have been entered concerning every stage of the electoral process), 112–114 (describing preclearance of changes in city of Montgomery, Ala.), 463–464 (stating that if Act were applied to Texas, § 5 would require preclearance of voting changes of cities and school districts, neither of which register voters [23]), and 568 (statement by Justice Department official that there is no need to clarify Act to make certain that city council redistricting is covered by § 5); 1975 House Hearings 332 (referring to city of Bessemer, Ala., as "covered jurisdiction") and 631–632 (describing lengthy § 5 preclearance process for Charleston, S. C.—a city which, like Sheffield, does not conduct

---

[23] See Tex. Elec. Code Ann., Art. 5.09 (Vernon 1967); Art. 5.13a (Vernon Supp. 1978).

134

voter registration).[24]  More significantly, both the House and Senate Committee Reports preclude the conclusion that § 5 was not understood to operate territorially.  Not only do the reports state that § 5 applies "[i]n [designated] jurisdictions," see S. Rep. No. 94–295, p. 12 (1975) (1975 Senate Report); H. R. Rep. No. 94–196, p. 5 (1975) (1975 House Report) (emphasis supplied), they also announce that one benefit of the proposed extension of the Act to portions of Texas would be that Texas cities and school districts—neither of which has ever registered voters—would be subject to the preclearance requirement.  1975 Senate Report 27–28; 1975 House Report 19–20.  Finally, none of the opponents of the 1975 legislation took issue with the common assumption that § 5 applied to all voting changes within covered States.  Indeed, they apparently shared this view.  See 121 Cong. Rec. S13072 (July 21, 1975) (remarks of Sen. Stennis) ("[a]ny [voting changes] . . . made in precincts, county districts, school districts, municipalities, or State legislatures, or any other kind of officers, ha[ve] to be submitted . . . to the Attorney General").  See also id., at S13331 (July 22, 1975) (remarks of Sen. Allen).

Whatever one might think of the other arguments advanced, the legislative background of the 1975 re-enactment is conclusive of the question before us.  When a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation, and this Court is bound thereby.  See, e. g., Don E. Williams Co. v. Commissioner, 429 U. S. 569, 576–577 (1977); Albemarle Paper Co. v. Moody, 422 U. S. 405, 414 n. 8 (1975); H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1404 (tent. ed. 1958); cf. Zenith Radio Corp. v. Hazeltine Research, 401 U. S. 321, 336 n. 7 (1971); Girouard v. United

---

[24] See S. C. Code §§ 7–5–10, 7–5–30, 7–5–610 to 7–5–630 (1977).

*States,* 328 U. S. 61, 69–70 (1946). *Don E. Williams Co.* v. *Commissioner, supra,* is instructive. As here, there had been a longstanding administrative interpretation of a statute when Congress re-enacted it, and there, as here, the legislative history of the re-enactment showed that Congress agreed with that interpretation, leading this Court to conclude that Congress had ratified it. 429 U. S., at 574–577. While we have no quarrel with our Brother STEVENS' view that it is impermissible to draw inferences of approval from the unexplained inaction of Congress, see *post,* at 149, citing *Hodgson* v. *Lodge 851, Int'l Assn. of Mach. & Aerospace Workers,* 454 F. 2d 545, 562 (CA7 1971) (Stevens, J., dissenting), that principle has no applicability to this case. Here, the "slumbering army" of Congress was twice "aroused," and on each occasion it re-enacted the Voting Rights Act and manifested its view that § 5 covers all cities in designated jurisdictions.[25]

In short, the legislative background of the enactment and re-enactments compels the conclusion that, as the purposes of the Act and its terms suggest, § 5 of the Act covers all political units within designated jurisdictions like Alabama. Accordingly, we hold that the District Court erred in concluding that § 5 does not apply to Sheffield.

### III

Having decided that Sheffield is subject to § 5, we must consider whether the District Court properly concluded that the Attorney General's failure to object to the holding of the referendum constituted clearance under § 5 of the method of electing city councilmen under the new government. Only a

---

[25] Our Brother STEVENS' dissent contends that the unambiguous legislative history of the 1970 and 1975 Acts of Congress is not a "reliable guid[e] to what Congress intended in 1965 when it drafted the relevant statutory language." *Post,* at 149. With respect, the dissent asks and answers the wrong question. It cannot be gainsaid that we are construing, not the 1965 enactment of § 5, but a 1975 re-enactment.

few words are needed to demonstrate that the District Court also erred on this point.

It bears re-emphasizing at the outset that the purpose of § 5 is to establish procedures in which voting changes can be scrutinized by a federal instrumentality before they become effective. The basic mechanism for preclearance is a declaratory judgment proceeding in the District Court for the District of Columbia, but the Act, of course, establishes an alternative procedure of submission to the Attorney General to give "covered State[s] a rapid method of rendering a new state election law enforceable." *Allen* v. *State Board of Education,* 393 U. S., at 549. Under the statute's terms, the Attorney General will be treated as having approved a voting change if such change "has been *submitted* . . . to [him] and [he] has not interposed an objection within sixty days after such *submission*" or if the change has been submitted and "the Attorney General has affirmatively indicated that such objection will not be made." 42 U. S. C. § 1973c (1970 ed., Supp. V) (emphasis supplied). See also *Georgia* v. *United States,* 411 U. S., at 540. While the Act does provide that inaction by the Attorney General may, under certain circumstances, constitute federal preclearance of a change, the purposes of the Act would plainly be subverted if the Attorney General could ever be deemed to have approved a voting change when the proposal was neither properly submitted nor in fact evaluated by him. But the District Court held precisely that.

First, it is clear on this record—and the District Court did not find otherwise—that Sheffield did not, in its March 20, 1975, letter, submit to the Attorney General a request for preclearance of the change in the City's form of government. Sheffield's letter sought approval only for the holding of the referendum.[26] Moreover, under the Attorney General's own

---

[26] In this connection it bears noting that the Attorney General's regulations provide that such letters should clearly set forth the proposed change affecting voting for which clearance is being sought. See 28 CFR §§ 51.5, 51.10 (a) (1976).

regulation, the validity of which is not questioned, the City could not at that time have sought preclearance of the change in the form of government because, as the March 20, 1975, letter stated, see n. 4, *supra,* the details of the change had not yet been worked out. See 28 CFR § 51.7 (1976).[27]

And there is no question but that the Attorney General did not intend to approve the proposed change to a mayor-council government and could not be understood as having done so. When the Attorney General wrote the City and told it that he had decided not to interpose an objection to the holding of the referendum, he warned that the change itself required prior federal scrutiny, and he apprised it of the information it should supply if it wished to attempt to preclear the change in government with the Attorney General, rather than in federal district court.

Under the circumstances, it is irrelevant that the Attorney General might have been on notice that, if the referendum passed, Sheffield would have been required by state law to adopt an at-large system of councilmanic elections.[28] Although

---

[27] In pertinent part, this provides that, "regarding a change as to which approval by referendum . . . is required . . . , the Attorney General may consider and issue a decision concerning the change prior to the referendum . . . if all other action necessary for adoption has been taken." Since it quite frequently will be the case that it will not be possible to determine whether a voting change has the purpose or effect of racial discrimination until all the variables of the change are known, there is no question but that this regulation is a reasonable means of administering the Act and, as such, is valid. See *Georgia* v. *United States,* 411 U. S. 526, 536–538 (1973).

[28] We observe that the District Court's conclusion that the Attorney General should have known that at-large elections were required by law is itself questionable for two reasons. First, at the time of the approval of the referendum, it is doubtful that the Attorney General could have been charged with knowledge of the particular provision of Alabama requiring at-large councilmanic elections in cities like Sheffield. The City's March 20, 1975, letter had not cited Ala. Code, Tit. 37, § 426 (Supp. 1973), which was in Art. 4 of Chapter 8 of Title 37. See n. 3, *supra.* The

the City could have easily placed the request for preclearance of the change in the form of government before the Attorney General—*i. e.*, by taking all action necessary for the completion of the change before submitting it, see 28 CFR § 51.7 (1976), and by stating in its letter that it desired preclearance of the change itself, see §§ 51.5, 51.10 (a)—it did not, so the Attorney General, quite properly, treated Sheffield as having sought prior clearance only of the referendum. Accordingly, the District Court erred in concluding that the Attorney General has to be understood as having approved the adoption of an at-large system of election.

Since we conclude that Sheffield is covered by § 5 of the Act and that the Attorney General did not clear the City's decision to adopt a system of government in which councilmen are elected at large, the judgment of the District Court is

*Reversed.*

MR. JUSTICE BLACKMUN, concurring.

Although I find this case to be closer than much of the language of the Court's opinion would indicate, I nevertheless join that opinion. I do so because I feel that whatever

---

District Court's conclusion that the Attorney General should have known of this provision of Alabama law would be sustainable only if we were to take the extreme position that the Attorney General should be charged with notice of all provisions of local law. Second, even had the Attorney General been aware of § 426 there was reason to believe that, regardless of any statutory requirement, the City would adopt a system of election directly by ward if the referendum passed. Both the Alabama Attorney General's 1968 opinion, see n. 3, *supra*, and the City's March 20, 1975, letter, see n. 4, *supra*, stated that Sheffield would return to the 1912 system, in which councilmen were elected by each of the four wards, if the referendum were to pass. Indeed, the record reflects that the City had some difficulty persuading the Attorney General that state law even permitted it to adopt an at-large system. Thus, it seems that the District Court's conclusion that the Attorney General must have known that at-large elections were required by law is itself questionable.

contrary argument might have been made persuasively on the § 5 issue a decade ago, the Court's decisions since then and the re-enactments by Congress, see *ante,* at 132–135, compel the result the Court reaches today.

MR. JUSTICE POWELL, concurring in part and concurring in the judgment.

Given the Court's reading of the Voting Rights Act in prior decisions, and particularly in *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969), and *Perkins* v. *Matthews,* 400 U. S. 379 (1971), I concur in the judgment of the Court. In addition, I concur in Part III of the Court's opinion.

Although my reservations as to the constitutionality of the Act have not abated,* I believe today's decision to be correct under this Court's precedents and necessary in order to effectuate the purposes of the Act, as construed in *Allen* and *Perkins.* In view of these purposes it does not make sense to limit the preclearance requirement to political units charged with voter registration. As the majority observes, *ante,* at 124, such a construction of the statute could enable covered States or political subdivisions to allow local entities that do not conduct voter registration to assume responsibility for changing the electoral process. A covered State or political subdivision thereby could achieve through its instrumentalities what it could not do itself without preclearance.

---

*See *Allen* v. *State Board of Elections,* 393 U. S. 544, 595 (Black, J., dissenting) (1969); *Georgia* v. *United States,* 411 U. S. 526, 545 (1973) (POWELL, J., dissenting). My reservations relate not to the commendable purpose of the Act but to its selective coverage of certain States only and to the intrusive preclearance procedure.

I agree with much of what MR. JUSTICE STEVENS says in dissent, but unless the Court is willing to overrule *Allen* and its progeny—a step it has refrained from taking—I view those decisions as foreshadowing if not compelling the Court's judgment today. I nevertheless record my total agreement with MR. JUSTICE STEVENS' view of the Act's preclearance requirement, *post,* at 141.

I agree with the Court that a more sensible construction of § 5, in view of and in accord with the statute's purpose, is to treat the governmental units responsible for changes in the electoral process within a designated State or political subdivision as the equivalent of the State or political subdivision. This construction also accords with Congress' understanding, cited by the District Court, that the designation of a State would imply the designation of its political subdivisions. In such a situation, the reason for including the political subdivisions is not that they are defined in § 14 (c)(2) and therefore might have been designated separately. Their eligibility for designation apart from the State is without significance once the entire State has been designated. Rather, the political subdivisions are covered because they are within the jurisdiction of the designated unit and might be delegated its authority to enact or administer laws affecting voting. Because the same is true of a governmental unit like the city of Sheffield that is not a "political subdivision" within the meaning of § 14 (c)(2), I agree with the Court that it too is subject to § 5 and must comply with its requirements.

MR. JUSTICE STEVENS, with whom MR. CHIEF JUSTICE BURGER and MR. JUSTICE REHNQUIST join, dissenting.

The principal question presented by this case is whether the city of Sheffield, Ala., is covered by § 5 of the Voting Rights Act of 1965.[1] If that question could be answered solely by reference to the Act's broad remedial purposes, it might be an easy one. But on the basis of the statute as written, the question is not nearly as simple as the Court implies. I believe it requires two separate inquiries: First, whether the city of Sheffield is a "political subdivision" within the meaning of § 5; and second, even if that question is answered in the negative, whether action by the city should

---

[1] The second question is, I believe, correctly answered in Part III of the Court's opinion.

be regarded as action of the State within the meaning of that section.

## I

· Briefly stated, § 5 provides that whenever a State or a political subdivision, designated pursuant to § 4, seeks to change a voting practice, it must obtain clearance for that change from either the United States District Court for the District of Columbia or the Attorney General of the United States.[2] This so-called "preclearance" requirement is one of the most extraordinary remedial provisions in an Act noted for its broad remedies. Even the Department of Justice has described it as a "substantial departure . . . from ordinary concepts of our federal system";[3] its encroachment on state sovereignty is significant and undeniable. The section must, therefore, be read and interpreted with care. As a starting point, it is clear that it applies only to actions taken by two types of political units—States or political subdivisions.

Since Alabama is a designated State under § 4, "each and every political subdivision within that State" is covered by § 5. See H. R. Rep. No. 439, 89th Cong., 1st Sess., 25 (1965). This does not, however, mean that the city of Sheffield is a "political subdivision" of Alabama covered by § 5. For the Act specifically defines "political subdivision," and that definition does not even arguably include an entity such as Sheffield.

Section 14 (c)(2) of the Act provides:

"The term 'political subdivision' shall mean any county or parish, except that where registration for voting is not

[2] See ante, at 112–113, n. 1.

[3] Hearings on S. 407 et al. before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 536 (1975 Senate Hearings) (testimony of J. Stanley Pottinger, Assistant Attorney General, Civil Rights Division). See also *South Carolina* v. *Katzenbach*, 383 U. S. 301, 358 (Black, J., concurring and dissenting); *Georgia* v. *United States*, 411 U. S. 526, 545 (POWELL, J., dissenting).

conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."

Sheffield is not a county or a parish, and it does not conduct registration for voting. Consequently, it is not a "political subdivision." [4]

The legislative history of § 14 (c)(2) demonstrates that the term "political subdivision" was defined for the specific purpose of limiting the coverage of the Act. Because the term had not been defined in the bill as originally drafted, Senator Ervin, among others, recognized that it might be read to encompass minor, local governmental units. It was to allay this concern that the definition was included in the Act.

"Senator ERVIN. This [an early version of the Voting Rights Act] not only applies to a State, but this would apply to any little election district in the State . . . .

"Attorney General KATZENBACH. I do not believe so, Senator. There is a question as to what the term 'political subdivision' means. I have taken the view in the other body and I would state it here that we are talking about the area in which people are registered, the appropriate unit for registering. I believe in every State

---

[4] The Court suggests that the term "political subdivision" refers to a geographic area and not to a political unit. *Ante*, at 128 n. 15. But this argument is repudiated by the plain language of the statute. Section 5 reads:

"Whenever a State or political subdivision . . . *shall enact* or seek to administer any voting qualification . . . ." (Emphasis added.)

Since laws are enacted and administered by political units, rather than geographic territories, the term necessarily has the former meaning as it is used in this section.

This conclusion is confirmed by other language in § 5: "[S]uch State or subdivision may institute an action . . . *Provided,* That such qualification . . . may be enforced . . . if . . . submitted by the chief legal officer or other appropriate official of such State or subdivision . . . ." Geographic territories do not institute actions or employ legal officers; but political units do.

that comes within the provisions of this, we are talking about no area smaller than a county or a parish.

"Senator ERVIN. Do you not think that you had better amend your bill to so provide, because in North Carolina, every municipality is a political subdivision of the State, even every sanitary district is a subdivision of the State. Also every election district is a subdivision of the State, every school district . . . every special bond, school-bond, district is a subdivision of the State.

"Attorney General KATZENBACH. I think that might be done to define political subdivision here in the bill in that way, Senator. That is what I intended." Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 44 (1965) (1965 Senate Hearings).

See also Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 21 (1965) (1965 House Hearings).

Later, during the Senate debate on the Voting Rights Act, Senator Ervin referred to the above dialogue with Attorney General Katzenbach and stated, without contradiction, that the term "political subdivision" had been defined to avoid a construction of the Act that would "confer jurisdiction upon the Federal Government to intervene in every ward of every city and town covered by the bill." 111 Cong. Rec. 9270 (1965). The Senate Report on the Voting Rights Act made the same point equally bluntly:

"This definition makes clear that the term 'political subdivision' is not intended to encompass precincts, election districts, or other similar units when they are within a county or parish which supervises registration for voting." S. Rep. No. 162, pt. 3, 89th Cong., 1st Sess., 31 (1965).[5]

---

[5] Ignoring the legislative history which explains why § 14 (c)(2) was inserted in the Act, the Court instead focuses on a statement by Senator

In short, whatever other ambiguities there may be in the Act, the definition of "political subdivision" is not one of them. It was clearly intended to limit the reach of the Act, and the definition clearly excludes cities, such as Sheffield, that do not register voters.

## II

The remaining question is whether a political unit that does not register voters may be regarded as the "State," as that term is used in § 5. If there were no contrary legislative history, it might be reasonable to treat the action of entities such as Sheffield, which are within the jurisdiction of a covered State, as "state action," just as such governmental action would be regarded as state action in a constitutional sense. However, such an interpretation of the word "State" would extend the reach of the statute to the same kind of purely local matters that Congress intended to exclude by defining the term "political subdivision."

As is apparent from the comments of Senator Ervin, quoted *supra*, there was congressional concern over whether the Act would extend to governmental units below the county level. That concern was repeatedly expressed and was specifically addressed in § 14 (c) (2). Unquestionably, as the Court recognizes, *ante*, at 128–129, that section protects small political units, such as school boards, from being separately designated for coverage under § 4 (b). The concerns which motivated this exclusion from § 4 (b) apply equally to § 5.[6] Indeed, the

---

Talmadge referring to § 5's application to cities. *Ante*, at 130–131. This statement, however, offers little support for the Court's view since Georgia, Senator Talmadge's home State, does have voter registration by cities. Ga. Code 34A–501 (1975).

[6] The Court reasons that since § 4 (a) was intended to apply throughout a designated State, § 5's preclearance requirement must have the same reach. This analysis is unpersuasive for three reasons. First, it does not give sufficient weight to the clear differences in statutory language between § 4 (a) and § 5. See n. 4, *supra*. When Congress wanted the

legislative history provides a perfectly logical explanation of why Congress deliberately limited the reach of § 5, as well as § 4 (b), to "political subdivisions," as defined by the Act.

First, a preclearance requirement limited to governmental units engaged in the registration process would be in accord with the fact that the Act was principally concerned with literacy tests and other devices which were being used to prevent black citizens from registering to vote. As Attorney General Katzenbach repeatedly emphasized, the "bill really is aimed at getting people registered." See 1965 House Hearings 21.[7]

---

term "State" to have a geographic reach, it was clearly capable of expressing that intent, as it did in § 4 (a). Its failure to do so in § 5 must be accorded some significance, especially when coupled with § 14 (c)(2)'s general purpose of excluding small political units from the Act's reach. Second, it does not adequately assess the reason for the inclusion of the § 14 (c)(2) definition of "political subdivision." Third, the Court has already recognized that § 5 was not intended to provide a remedy for every wrong committed in a State in connection with voting.

"It is irrelevant that the coverage formula excludes certain localities which do not employ voting tests and devices but for which there is evidence of voting discrimination by other means. Congress had learned that widespread and persistent discrimination in voting during recent years has typically entailed the misuse of tests and devices, and this was the evil for which the new remedies were specifically designed. At the same time, through §§ 3, 6 (a), and 13 (b) of the Act, Congress strengthened existing remedies for voting discrimination in other areas of the country. Legislation need not deal with all phases of a problem in the same way, so long as the distinctions drawn have some basis in practical experience." South Carolina v. Katzenbach, 383 U. S., at 330–331.

[7] The following dialogue is illustrative:

"The CHAIRMAN. The bill also refers to 'political subdivisions.' How far down the political scale does that go?

"Mr. KATZENBACH. I believe that the term 'political subdivision' used in this bill . . . really is aimed at getting people registered.

"The CHAIRMAN. For example, in New York. . . . I take it that an election district would be deemed a political subdivision?

"Mr. KATZENBACH. I think that is possible, Mr. Chairman, but frankly, you are more familiar with how registration is accomplished in

Second, the Act limits judicial review of an election change under § 5 to a three-judge District Court sitting in the District of Columbia. The opponents of the Act frequently expressed their outrage at this limitation, arguing that it was unfair to make people travel "250 or 1,000 or 3,000 miles in order to gain access to a court of justice." See, e. g., 1965 Senate Hearings 43 (remarks of Sen. Ervin); 111 Cong. Rec. 10371 (remarks of Sen. Ellender) (1965). Proponents of § 5 justified the provision on the ground that it would not be difficult or unusual for a State, county, or comparable body to have to make its arguments in Washington, D. C. See, e. g., Senate Hearing 44 (testimony of Attorney General Katzenbach). Senator Javits' comments on the floor of the Senate are typical of this line of argument:

> "Finally, it cannot be claimed that the bill is unfair to litigants other than the Federal Government because we are not dealing with litigants who are unable to pursue a legal remedy. We are not dealing with litigants who might find travel difficult or legal proceedings or appearances expensive. We are dealing with political subdivisions and States, which have county attorneys or State

---

New York than I am. I know how it is accomplished or not accomplished in Alabama.

"The CHAIRMAN. What would be the lowest possible political unit in the scale?

"Mr. KATZENBACH. What is the area in which registration is done in New York? I am not familiar with that, Mr. Chairman." 1965 House Hearings 21.

Similar testimony was referred to by the Court in *Allen* v. *State Board of Elections,* 393 U. S. 544, 564.

The fact that *Allen* broadly construed the Act to apply to gerrymandering and other techniques which "dilute" the weight of some votes cannot obscure the fact that voter registration was the central concern of the Act when it was passed in 1965. Indeed, *Allen*'s creative interpretation of the statute was so dramatic that it was given only prospective application. See *id.,* at 572.

attorneys general who come to Washington, D. C., for many things, and they would not be required to come to Washington merely to participate in litigation that might arise under the bill." 111 Cong. Rec. 10363 (1965).

Obviously, this same argument does not apply to most townships, school boards, and the numerous other small, local units involved in the political process. Whether or not it would be "fair" to make these smaller political units argue their cases only in Washington, D. C., the drafters and supporters of the Act gave assurances that § 5 was not so intended. A broad definition of "State" would nullify those assurances just as surely as a loose interpretation of "political subdivision."

Finally, the logistical and administrative problems inherent in reviewing *all* voting changes of *all* political units strongly suggest that Congress placed limits on the preclearance requirement. Statistics show that the Attorney General's staff is now processing requests for voting changes at the rate of over 1,000 per year,[8] and this rate is by no means indicative of the number of submissions involved if all covered States and political units fully complied with the preclearance requirement, as interpreted by the Attorney General.[9] Furthermore, under the statute each request must be passed upon within 60 days of its submission. This large and rapid volume

---

[8] While approximately 6,400 voting change requests have been submitted since the Act was passed, the submissions have not been evenly divided among the 13 years of the Act's existence. Approximately 5,800 of the 6,400 submitted changes were made from 1971 on. See 1975 Senate Hearings 597; Jurisdictional Statement 13–14. The figure of 8,100 cited by the Court, *ante,* at 131 n. 19, *supra,* refers to the number of voting changes included within the submissions.

[9] Assistant Attorney General Pottinger testified in 1975 that "Section 5 has yet to be fully implemented." 1975 Senate Hearings 583. In fact, the Attorney General has had to ask the FBI to conduct investigations to help determine whether local authorities have made any changes in voting procedures that are not reflected in state statutes. *Ibid.*

of work is a product, in part, of this Court's decision in *Allen*.[10]
But even apart from *Allen*, it is certainly reasonable to believe
that Congress, having placed a strict time limit on the Attor-
ney General's consideration of submissions, also deliberately
placed a limit on the number and importance of the submis-
sions themselves.[11] This result was achieved by restricting
the reach of § 5 to enactments of either the States themselves
or their political subdivisions, as defined by § 14 (c)(2).

Neither the "contemporaneous" construction of the Act by
the Attorney General nor the subsequent amendments of § 5
by Congress, in my judgment, undermine the validity of this
reading of the section. The Court asserts that the "Attorney
General has, since the Act was adopted in 1965, interpreted
§ 5 as requiring all political units in designated jurisdictions
to preclear proposed voting changes." *Ante*, at 131. The
unambiguous historical evidence is to the contrary.

The Department of Justice did not adopt regulations
implementing § 5's preclearance provisions until September
1971, six years after the passage of the Act and nearly two
years after this Court's decision in *Allen*. 36 Fed. Reg. 18186;
see *Georgia* v. *United States*, 411 U. S. 526. And it was not
until the *Allen* decision that the Department even attempted

---

[10] Prior to the *Allen* decision in 1969, only three States had submitted
any voting changes to the Attorney General for approval, for a total of 323
submissions during a five-year period. *Id.*, at 597. There was a dramatic
leap in submissions between 1970 and 1971, from 255 to 1,118. *Ibid.*
These figures reveal the obvious impact that *Allen* and *Perkins* v. *Matthews*,
400 U. S. 379, have had on the Attorney General's implementation of § 5.

[11] The sheer number and insignificance of the changes in voting proce-
dures in local political units that must, under today's decision, be submitted
to the country's highest legal officer suggest that Congress may have
limited the reach of § 5 in order to insure the preclearance requirement's
effectiveness and solemnity. Paradoxically, the Court's effort to eliminate
any remedial "gaps" in the statute may reduce the preclearance require-
ment to a trivial, though burdensome, administrative provision. As would
be expected, almost all submissions are routinely accepted by the Attorney
General. See 1975 Senate Hearings 582.

to develop standards and procedures for enforcing § 5. See 1975 Senate Hearings 537 (testimony of Assistant Attorney General J. Stanley Pottinger). In short, there was no "contemporaneous" construction of the Act by the Attorney General. It may have been reasonable for the Attorney General, in promulgating regulations after the *Allen* decision, to have assumed that, since the section now covered all voting changes and not simply registration changes, all political units and not simply political subdivisions were also covered. But that assumption sheds no light on Congress' intention in passing the Act in 1965.

Nor, in my judgment, are the subsequent amendments of the Act in 1970 and 1975 reliable guides to what Congress intended in 1965 when it drafted the relevant statutory language. The 1970 and 1975 extensions of the Act did not change the operative language in § 5 or alter the definition of the term "political subdivision." As I suggested a few years ago, "[a]n interpretation of a provision in [a] controversial and integrated statute . . . cannot fairly be predicated on unexplained inaction by different Congresses in subsequent years." *Hodgson* v. *Lodge 851, Int'l Assn. of Mach. & Aerospace Workers,* 454 F. 2d 545, 562 (CA7 1971) (dissenting opinion).[12]

---

[12] In response to this dissenting opinion, the Court has suggested that in focusing on the language of § 14 (c) (2) and in searching through the 1965 legislative history, I have sought an answer to the wrong question because we are construing the 1975, rather than the 1965, Act. *Ante,* at 135 n. 25. However, the question whether the Act was "re-enacted" in 1975 is of only technical significance. Section 5 would have continued in operation beyond 1975 for States such as Alabama even without the 1975 extension. See comments of Senator Tunney, 121 Cong. Rec. 24706 (1975). More importantly, the 1975 Congress made no change in the definition of "political subdivision" and no one called its attention to any aspect of the issue decided today. The question I have tried to answer is what Congress actually intended to accomplish by its definition of the term "political subdivision." That definition was, perhaps, the product of a

In sum, I am persuaded that the result the Court reaches today is not a faithful reflection of the actual intent of the Congress that enacted the statute. I therefore respectfully dissent.

---

legislative compromise, and the resulting statutory language may be "crippling" to the Court's reading of the full remedial purposes of the statute. But we have an obligation to respect the product of legislative compromise as well as policy decisions we wholeheartedly endorse.